MERRITT M. ROBINSON AND MARGUERITE HIS WIFE, AURORE GAY-OSO, FERNANDO GAYOSO, AND FELICITE GAYOSO, APPELLANTS, *v.* WM. J. MINOR, JAMES C. WILKINS, AND HENRY CHOTARD, EXECUTORS OF THE LAST WILL AND TESTAMENT OF KATHARINE MINOR, DECEASED, FRANCES CHOTARD, KATHARINE L. WILKINS, AND WM. J. MINOR.

By the treaty of 1795, between the United States and Spain, Spain admitted that she had no title to land north of the thirty-first degree of north latitude, and her previous grants of land so situated were of course void. The country, thus belonging to Georgia, was ceded to the United States in 1802, with a reservation that all persons who were actual settlers on the 27th of October, 1795, should have their grants confirmed. (See also 3 Howard, 750.)
On the 3d of March, 1803, Congress passed an act (2 Stat. at Large, 229) establish-

Robinson et al. *v.* Minor et al.

ing a board of commissioners to examine these grants, whose certificate in favor of the claimant should amount to a relinquishment, for ever, on the part of the United States.

Without such confirmation by the United States, a grant of land situated on the north side of the thirty-first degree of latitude, issued by the Governor-General of Louisiana in 1794, would have been void. But it was confirmed by the board of commissioners, and is therefore valid.

The original grantee indorsed upon the grant that he had conveyed it to a woman, whom he afterwards married, and referred to another instrument of conveyance; and in all subsequent transfers there was a reference to that same instrument, reciting its date, and that it accompanied the deeds executed. The confirmation of the commissioners followed and adopted this chain of title.

That instrument of conveyance being lost, it may be presumed, under the circumstances, that the original grantee intended to convey to his wife a greater estate than the law would have endowed her with upon the marriage.

Even supposing that the confirmation of the commissioners was not conclusive, yet the facts of the case show a superior equity in the title of the wife over that of the child of the original grantee; viz. the motive which led to the conveyance; the fact that the widow sold the property for its full value, saw the premises occupied by persons claiming them in fee for thirty years, and never informed her son that he had a right to the property after her decease.

THIS was an appeal from the Circuit Court of the United States for the Southern District of Mississippi, sitting as a court of equity.

The circumstances of the case were these.

On the 1st of July, 1794, Gayoso de Lemos presented the following petition to the Governor-General of Louisiana: —

"To the Governor-General: — Col. Manuel Gayoso de Lemos, governor of the town and district of Natchez, to your honor sayeth, that he owns at half a league from this town a tract of land which he has bought to build thereupon a house, and to raise the commodities that will do to his family; but being also in want of pasture for his horses and other quadrupeds, or animals, petitioner therefore begs of your honor to give order to the deputy-surveyor of this district to extend the boundaries of the said land to increase it to contain one thousand arpents; and petitioner will ever pray.

(Signed,)          MANUEL GAYOSO DE LEMOS.

"*Natchez, July 1st, 1794 — say 1794:*"

On the 8th of August following the governor issued the following order to Carlos Trudeau, the surveyor: —

"*New Orleans, 8th July,* 1794.

"Granted. — The surveyor having to designate the limits in the notes of survey, which shall be exhibited to me, so that a title in a due form may be extended to the party.

(Signed,)          EL BARON DE CARONDELET."

A plat was accordingly made out, and returned on the 3d

of September, upon which a grant was issued. No translation of the grant being in the record, the original is not inserted.

On the 12th of February, 1795, the following indorsement was made upon the grant.

" Recorded. Natchez, 12th day of February, 1795. This grant is transferred to Mrs. Margaretta Watts by a written instrument made on this day.

" MANUEL GAYOSO DE LEMOS."

Soon after this, either in the year 1795 or the early part of 1796, a private marriage took place between Gayoso and Margaret Watts. The reasons for its being private are thus explained in the deposition of Judge King, and in the letters of Gayoso himself to Mr. Wikoff, the brother of Mrs. Watts.

*Judge King's Testimony.*

" To the first interrogatory he saith, he believes that Fernando Gayoso was born at Natchez, in the year 1796 or 1797, and that he was the legitimate son of Don Manuel Gayoso de Lemos and Margaret Watts; and witness will proceed to state, as he is requested in the interrogatory, some of the circumstances which induce his belief. Some time in the year 1797 or 1798, Don Manuel Gayoso was made governor of the Province of Louisiana, and arrived at New Orleans in one of those years to take charge of his government. He came to the city in a barge, and landed immediately opposite the store of witness. Witness, being acquainted with the governor, went on board the barge with others to welcome his arrival. Mrs. Gayoso (Margaret Watts) was with the governor, and had her son, the said Fernando Gayoso, then an infant, in her arms; witness, to the best of his recollection, took the child from his mother's arms, and carried him on shore. Witness had known the said Mrs. Gayoso as Miss Margaret Watts, previous to her first marriage. Having been the bearer of a letter of introduction from General Wilkinson in 1793 to Governor Gayoso, then governor of Natchez, witness was invited to his house, where he became acquainted with his family, then consisting of Mrs. Watts, the mother-in-law, and Miss Margaret Watts, his sister-in-law.

" In the year 1796 or 1797 it was currently reported and believed in the city of New Orleans, where witness then resided, that Governor Gayoso had been privately married to Margaret Watts at Natchez, which marriage could not be publicly acknowledged, because it had been contracted without the permission of the king of Spain, or perhaps the dispensation of the

53 *

Pope was needed, as the former wife of Governor Gayoso had been a sister of Margaret Watts, or perhaps for both these reasons. Some time after the arrival of Governor Gayoso at New Orleans, the Bishop of Havana happening to be there, and the impediments to the marriage, whatever they were, having been removed, the nuptial ceremony was publicly solemnized by the bishop. Witness was not present at the marriage, but the fact that it was celebrated was one of general notoriety, and universally believed in the city of New Orleans. Witness was frequently at the house of Governor Gayoso in the city of New Orleans, where he saw Mrs. Gayoso (Margaret Watts) and Fernando Gayoso, and on all occasions the former was treated as the wife of the governor, and the latter as the child of their marriage. Mrs. Gayoso, as witness always understood, was, after the death of Governor Gayoso, treated by the Spanish government as his widow, and as such allowed during her widowhood a pension equal to half the annual salary of her deceased husband. Fernando Gayoso lived with his mother during his minority, except when at school, and was always spoken of by her as the issue of her marriage with Don Manuel Gayoso de Lemos. Margaret Watts left at her death several other children, issue of a second marriage. At the settlement of her succession, Fernando Gayoso was treated as one of her legitimate heirs, and as such received his portion. From all these circumstances, witness, who knew the parties from the dates already stated to those of their respective deaths, has always believed that Fernando Gayoso was the legitimate son of Don Manuel Gayoso de Lemos and Margaret Watts, his wife."

*Letters of Gayoso to Mr. Wikoff.*

(These letters were produced and proved by Eliza Parrott, the daughter of Mr. Wikoff.)

*" New Orleans, 21st February,* 1796.

" My dear friend, — I suppose that by this you and my dear sister are acquainted with my return from my long campaign, by a letter that our mamma wrote, as I arrived at the Natchez. Now this is to inform you that by the last packet I received my promotion as brigadier-general for my former services, and I still hope that the ensuing packet will bring me some other good news, in recompense of the successful campaign that I have finished. The last was a general promotion, in which the Governor-General of this Province was made major-general, and several others promoted.

" A neighbor of yours is just going away, so this is just to repeat to you my affection, to give my love to my dear sister,

and to embrace your sweet children. . Tell Manuel that he must come to see his godfather. Indeed, my friend, we must continue to make ourselves happy with an interview of our families; our dear mamma will look upon such an event as the greatest blessing she could experience; therefore you must begin to think how to bring it about.

" As I am assured that you have been puzzled by the news mamma wrote of our connection being brought to an issue, I must explain it; that very day our contract was signed before many witnesses, and likewise an elegant country-house, with one hundred acres bordering the town that I settle on my dear Peggy, besides a very considerable allowance of my estate; however, for the public, I must wait for the king's permission, which is important to Peggy to secure her the military pension; but this will be had by the latter end of this year, and perhaps by that time some considerable alteration in my public station, which I hope may enable me to serve you.

" I repeat my affectionate love to my dear sister and children, and I remain, sincerely, your truest friend and humble servant.

MANUEL GAYOSO DE LEMOS."

" *Natchez, March 6th,* 1797.

" My dear friend, — The American commissioner, Mr. Elicot, arrived here, and in a few days I shall set off with him to have the first conference with the Baron near Clark's. Perhaps we may fix the first point immediately, but it will be some time yet before we proceed any further; therefore, I shall return to this place. In this situation I am overpowered with business.

" I wait with impatience for the necessary permission to publish my marriage, which, however, is as binding now; but the public sanction is necessary; I am in hopes that it will arrive by the first packet. General Former is lately arrived here with his daughter, married to Dr. Longstreet, whom I suppose you know, though he is very young — (I mean Mr. Longstreet). He thinks of paying you a visit; it seems that he is related to you.

" My kind, affectionate regard to my sister and children; and I remain, sincerely, your most humble, obedient servant and friend,        MANUEL GAYOSO DE LEMOS."

" *New Orleans, 18th August,* 1797.

" My dear friend, — Though as busy as you may suppose at my arrival here, I do not wish to let this opportunity pass without renewing to you and to my dear sister the sincere assurances of my affection and attachment for you. I left our

friends well at Concord, with the addition of a fine boy that four days hence will be one month old. At the beginning of October I shall send my galiot for your sister, whom I did not bring down on account of the excessive heat, and because she would find the house not conveniently furnished at our first arrival. The retard of the packet from Europe was the cause of the delay of the king's permission, as likewise of my promotion to the command of the province, signed by the king the 20th of October last; however, they both arrived at the same time, and restored tranquillity to our friends.

" When we are fixed at home, I shall insist on a visit from my dear sister, &c., &c., one of these days. I shall prepare a summons, which I shall send up to Concord, to be signed by Lady Governante, as belonging to her department, to obtain the desirable end. The new governor of Texas is a friend of mine. I have already wrote to him an account of your negroes, but it would be necessary to have names and description, which, if you send to me, I'll have circulated in all the outposts, &c.

" If I can be of any service to you, I need not add here complimentary expressions, I shall do it cheerfully. My love to my dear sister and all the little cohort. I hope she has been happily delivered, and that you all enjoy good health.

" I am, sincerely, your most humble servant and friend,

MANUEL GAYOSO DE LEMOS."

On the 14th of July, 1797, Fernando was born, as appears from the following certificate: —

" Manuel Gayoso de Lemos, brigadier of the royal armies, military and civil governor of the town and district of Natchez, &c., on this Friday, 14th July, 1797, at seven minutes to one o'clock in the morning, my wife, Margaret Watts Gayoso, was delivered of a robust and healthy child, to whom I determined to give the name of Fernando.

MANUEL GAYOSO DE LEMOS."

On the 10th of December, 1797, the official ceremony of marriage was performed, as shown by the following certificate.

" No. 422. — On Sunday, 10th of December, of the year 1797, the most Christian Don Luis Tenalver y Cardenas, most worthy prime bishop of this diocese of Louisiana and Floridas, of the Council of his Majesty, married and imparted the nuptial benediction to Don Manuel Gayoso de Lemos, brigadier of the royal armies of his Catholic Majesty, civil and military governor of the

*Marriage of Don Manuel Gayoso de Lemos and Miss Margaret Watts.*

aforesaid province, a native of the kingdom of Galicia, and Margaret Watts, his legitimate wife, native of Baton Rouge, district of this same government. They performed confession and communion, and to certify the above, I sign.

"FR. ANTONIO DE SEDELLA.

" The above is a true copy from the original, kept in the archives of the above church for reference. New Orleans, 23d August, 1844.

" ANT. DULUC,
*Secretary of the Vestry of the St. Louis Church."*

In July, 1799, Gayoso died, and was buried in New Orleans, being then civil and military governor of the Province of Louisiana.

On the 10th of August, 1799, Margaret Watts Gayoso conveyed to Daniel Clark, Jr., for the consideration of $5,000, a certain plantation or tract of land, " known by the name of Concordia, situated, lying, and being in the Mississippi Territory, in the United States of America, about half a league northeast of the fort of Natchez, containing one thousand acres, or arpents, be the same more or less, as is fully expressed in the grant and plan of said land, No. 632, accompanying this bill of sale "; and accompanied the sale with a general warranty.

On the 15th of August, 1800, Daniel Clark conveyed the property to William Lintot for ten thousand dollars. The deed contained the following recital: —

" This indenture, made this 15th day of August, in the year 1800, between Daniel Clark, of the Mississippi Territory, of the one part, and William Lintot, of the Territory aforesaid, witnesseth : That whereas, on the 10th day of September, in the year 1794, there was granted by the Baron de Carondelet, Governor of Louisiana, unto Don Manuel Gayoso de Lemos, a tract or parcel of land, called Concord, containing, by estimation, one thousand acres, with the appurtenances, situated in the district aforesaid, as per plat and grant accompanying this will more fully appear. And whereas, by an instrument of writing, which also accompanies this, dated the 12th day of February, in the year 1795, the said Don Manuel Gayoso de Lemos did, for certain considerations therein recited, convey the said land, with all the appurtenances, to Margaret Watts; and whereas the said Margaret Watts, now the widow of the said Don Manuel Gayoso de Lemos, by her deed dated the 10th day of August, 1799, which also accompanies this, did convey the said land with the appurtenances to Daniel Clark, then junior, for the valuable consideration of five thousand dollars," &c.

On the 15th of November, 1800, Lintot conveyed to Stephen Minor, the ancestor of the appellees.

In 1802, a contract was made between the United States and the State of Georgia, by which Georgia ceded to the United States all the territory in which the granted land was. But it was stipulated in the deed of cession, that " all persons who, on the 27th of October, 1795, were actual settlers within the territory thus ceded, should be confirmed in all the grants legally and fully executed prior to that day, by the former British government or the government of Spain." This agreement between the United States and Georgia will be found in 1 Land Laws, 588.

On the 3d of March, 1803, Congress passed an act (2 Stat. at Large, 229), entitled " An Act for regulating the grants of land and providing for the disposal of lands of the United States, south of the State of Tennessee." This act established a board, before which all claims were to be brought, and the sixth section provided that, where it shall appear to the board that the claimant is entitled to a tract of land under the articles of agreement and cession with Georgia aforesaid, in virtue of a British " or Spanish grant legally and fully executed, they shall give a certificate thereof, describing the tract of land and the grant, and stating that the claimant is confirmed in his title thereto by virtue of the said articles; which certificate, being recorded by the register of the land-office, shall amount to a relinquishment for ever on the part of the United States."

In 1804, the following proceedings took place before the board : —

" Monday, the 10th of September, 1804, the board met.

" No. 1220. Stephen Minor claims one thousand arpents, Spanish patent to Manuel Gayoso, dated the 12th of September, 1794, who assigned and transferred the same to Margaret Watts, afterwards Margaret Watts Gayoso, the 12th of February, 1795, who conveyed the same to Daniel Clark by deed dated the 10th of August, 1799, who conveyed the same to William Lintot, the 15th of August, 1800, who conveyed the same to the present claimant on the 15th of September, 1800; the patent to Gayoso, assignment to Margaret Watts, deed from Margaret to Clark, deed from Clark to Lintot, and deed from Lintot to Stephen Minor, were produced in evidence, filed with the register.

" Witness William Barland on oath says, that Margaret Watts Gayoso was an actual settler in the Mississippi Territory on the 27th of October, 1795."

And on the 18th of September, 1805, the following certificate was issued : —

" A No. 610.          *Mississippi Territory.*          Register 1220.

" Board of Commissioners west of Pearl River, established by a law of Congress regulating the grants of land, and providing for the disposal of lands of the United States south of the State of Tennessee.

" Stephen Minor claims a tract of seven hundred and fifty-six arpents of land, situated in Adams County, near the city of Natchez, by virtue of a grant under the authority of the Spanish government, to Manuel Gayoso de Lemos, for one thousand arpents, bearing date the 12th day of September, in the year 1794, having such shape, form, and marks, both natural and artificial, as are represented in the plat annexed to said grant, and legally conveyed to the claimant.

" We do certify, that the said Stephen Minor is confirmed in his title thereto by virtue of the articles of agreement and cession between the United States and Georgia.

" Given under our hands, at the town of Washington, in the county of Adams, this 18th day of September, in the year 1805, and in the thirtieth year of the independence of the United States.                    " ROBERT WILLIAMS,
                          THOMAS H. WILLIAMS,
                                    *Commissioners.*"


It was admitted that those who claimed under Minor had been in possession since the issuance of the certificate of confirmation.

In December, 1805, Margaret Watts Gayoso married Captain Stelle of the United States army.

Stelle died in 1819, and Margaret in 1829.

On the 9th of May, 1832, Fernando Gayoso de Lemos, a citizen of Louisiana, filed a bill in the Circuit Court of the United States for the Southern District of Mississippi, against Job Routh, Katharine Minor, John Minor, executor of Stephen Minor, and John William Minor, of Mississippi.

The bill charges that the complainant is the lawful son and only heir of Manuel Gayoso de Lemos, deceased, and that the said Manuel was, on the 27th of October, 1795, an actual settler within the Territory, now the State, of Mississippi, ceded by Georgia to the United States on the 14th of April, 1802; that he then held a grant legally and fully executed prior to the 27th of October, 1795, by the government of Spain, for 1,000 arpents of land, now situated in Adams County, Mississippi; that he or his legal representatives were entitled to a confirmation of that grant by the articles of cession between the United States and Georgia, and that the said Manuel's wife, Margaret,

the complainant's mother, survived her husband, married James Stelle in 1804 or 1805, and died in 1829, and that Stelle died in 1819.

The bill further states, that Stephen Minor, deceased, late of Adams County, Mississippi, became possessed of the evidences of the said Manuel's said title, and after the death of the said Manuel, and during the infancy of the complainant, and while he resided in Louisiana, procured from the board of commissioners, west of Pearl River, the issual to him, in his own name, of a certificate for 760 arpents of said land, which certificate was so unlawfully, falsely, and by imposition procured to the said Minor in fraud of the complainant's rights, and of right belonged and ought to have issued to the complainant as sole legal heir of the said Manuel; that Stephen Minor died in 1815 or 1816, leaving his wife Katharine (one of the defendants) devisee and trustee of all his estate, and making her and John Minor (also a defendant), his executors; and that the executors on the 25th of January, 1829, conveyed the land to the defendant William J. Minor, the son of Katharine Minor, who, on the same day, reconveyed to his mother, in whose possession it now is, with the Spanish grant, as it was before in her husband's possession, and that before these last-mentioned conveyances the parties to them were aware of the complainant's claim.

The bill further states, that Job Routh, then and now a citizen of Adams County, Mississippi, procured from the same board of commissioners, in like manner as Minor, a certificate for 244 arpents of said tract, under and by virtue of the said evidence of the said title of the complainant's father, and has long been in possession, and that said certificate belonged and ought to have issued to the complainant.

The bill prays that Katharine Minor and Job Routh may be decreed to convey the land to the complainant, and deliver him the evidence of the title to it, and to account for the rents and profits, and for general relief.

After sundry proceedings of demurrers, which were overruled, and bills of revivor, which it is not necessary to state, the defendants answered, in November, 1845.

The answer sets out the title at law of the appellees, beginning with the Spanish grant which lies at its foundation, tracing the assignment of that grant through its several successive holders to Stephen Minor, showing Minor's application under it to the board of commissioners, west of Pearl River, appointed by virtue of the act of Congress of 3d March, 1803, " for regulating the grants of land, and providing for the disposal of lands of the United States south of the State of Tennessee,"

and the certificate of the board in his favor, and thence deducing their title regularly from him. It denies that the certificate was issued to Stephen Minor unlawfully, falsely, or by imposition or fraud; and avers that the Concord plantation has been in the possession of them, and those under whom they claim, since the 10th of August, 1799.

The answer does not admit Fernando Gayoso to be the lawful son and heir of Manuel Gayoso, or that said Manuel married Margaret Watts, or that she left children, or the date of the death of the said Manuel or Margaret, or the age of the said Fernando at the time of the death of the said Manuel, and requires proof of the averment of the bill on these heads.

The answer further denies that the said Manuel Gayoso was an actual settler, within the meaning of the act of Congress of 27th October, 1795, and that the appellees had any notice of the claim of the appellants prior to the commencement of the suit; and, in addition, relies on the failure of the appellants to file their bill within twenty years after the accrual of the right in virtue of which they claim.

To this a general replication was filed, and a large mass of evidence was taken.

In November, 1847, the cause was discontinued as to the heirs of Job Routh, and abated as to Austin Williams, Archibald Williams, and Elias Ogden. It then came up for argument on the bill, answers, exhibits, and proof, when the Circuit Court dismissed the bill, with costs.

The complainants appealed to this court.

It was argued by *Mr. Bullard*, for the appellants, and *Mr. J. Mason Campbell*, for the appellees.

*Mr. Bullard*, for the appellant, said, that, before stating the points of law in the case, it was proper to say, that the judge of the District of Mississippi gave as a reason for dismissing the bill, although no written opinion was delivered, the decision of this court in the case of the Lessee of Hickey and others *v.* Stewart and others, 3 Howard, 761. That case appears to be totally different from this. Starke claimed under an order of survey which had never been presented to the board of commissioners for confirmation, under the act of 1803, and this court held that the court of chancery, in taking cognizance of Starke's claim, and establishing it by its own judgment and decree, transcended its jurisdiction. The Gayoso title, as exhibited in this case, was complete and fully executed, as contemplated by the compact with Georgia in 1802, and was presented to the commissioners and confirmed; but confirmed not

in favor of the heir-at-law to whom the fee had descended, but to Minor, under a pretended right of Margaret Watts Gayoso, and we charge Minor as the trustee of the infant heir of Don Manuel Gayoso de Lemos. There is no analogy between the two cases.

He then stated the following points:—

The first, and indeed the principal, question in the case is, What degree of estate or interest did Clark, Lintot, and Minor acquire under the conveyance of Mrs. Margaret Gayoso after the death of her first husband? or, in other words, what was the extent of her right to or in the land?

I am willing to test this question either by the Spanish law, which was, at least to a certain extent, in force in the district of Natchez, or by the common law; supposed to prevail in Georgia at that time. I say to a certain extent, because I freely admit that Spain, not being the sovereign *de jure*, had no right to dispose of any of the public domain; but being, until 1798, the sovereign *de facto*, having its governor, its tribunals of justice, and a body of laws or usages, in reference to which all contracts and donations were made, and which regulated all the civil transactions of the people and the mutual relations and capacities of individuals, the Spanish law was the living law of the people; by it were regulated the transfers of all property once severed from the domain, whether by contract, or last will, or *ab intestato;* every question of marriage, of legitimacy, of donations, either *mortis causâ* or *inter vivos*, which arose during the sovereignty *de facto* of Spain, ought to be tested by the Spanish law.

I. What, then, was the Spanish law applicable to this case, as it relates to the degree of estate acquired by Madame Gayoso? And here I assume, what is most favorable to the pretensions of the defendants, and rendered most probable by the evidence, that the land in question was settled on Miss Watts as a donation in consideration of marriage, or a *donatio propter nuptias*.

Upon that supposition she acquired the land in full property, defeasible on her second marriage; in which event her right would be reduced at once to a usufruct during her natural life on a life estate, and on her decease the land would descend to the heir of the donor or first husband exclusively. I rely on the following authorities. 5 Partida, law 26, title 13; Commentary of Gregorio Lopes; 15 Law of Toro; Gomez ad Leges Tauri, (commentary,) note 1st. Original Roman Law:—Justinian, Code, lib. 5, tit. 9, § 3; 2 Pothier's Traité du Mariage, Nos. 605, 613, 614; Fibrero, part 1, chap. 3.

II. But supposing that the common law, or the law of Geor-

gia, is to govern, as was contended by the defendants, what interest or estate did Madame Gayoso acquire in the tract of land according to the evidence in the record? It will be conceded that, according to both systems of law, the only son is the heir of the father; and leaving out of view the transfer to Margaret Watts, Fernando Gayoso would have inherited the fee simple; and the title was perfect, according to the compact with the State of Georgia. I contend, then, that, according to the common law, Margaret Watts acquired at most a life estate, with remainder over in fee to the heir-at-law of Don Manuel Gayoso de Lemos, to wit, Fernando Gayoso, and that her vendee acquired no greater interest or estate.

The indorsement of Gayoso on the patent is not a deed conveying the fee simple. It conveyed no interest which would go to her heirs; it contains no words or expressions to that effect. Standing alone, it gave her a mere life estate, with remainder over to the heirs of Gayoso.

Nor is it cured by any other part of the evidence. On the contrary, it being admitted that some conveyance from Gayoso to his future wife accompanied the several mesne conveyances, and it not being produced as the highest evidence, the presumption is, it conveyed no higher interest than the indorsement itself. The recital in those deeds points to higher evidence than this mere indorsement on the patent, and cannot avail the party until he accounts for the original. Notes to Phillips on Evidence, Part 2, 1236; 1 Greenleaf on Evid. 93.

III. The compact with Georgia confirms the title of Gayoso, without the necessity of any act on the part of the United States, except a mere certificate requiring no patent. See Act of 1803, § 6 (2 Stat. at Large, 231).

This certificate adds nothing to the validity of the original patent. See Hickie et al. v. Starke et al., 1 Peters, 94.

IV. Fernando Gayoso was the infant heir of Don Manuel Gayoso at the time Minor, having possessed himself of the patent, obtained the confirmation to himself, without showing any conveyance from the original grantee, which cut off his heir at law. He will then be held to be the trustee of the legal title of the infant heir, and condemned to convey the land, and account for the rents and profits. See Gaines et ux. v. Chew et al., 2 Howard, 650 – 655; Dormer v. Fortescue, 3 Atk. 130; Roberdeau v. Rous, 1 Atk. 543; Hutton v. Simpson, 2 Vern. 724; Townsend v. Ash, 3 Atk. 336; Mundy v. Mundy, 2 Ves. jr. 122.

If it should be contended that Minor was an innocent purchaser without notice, and to be protected, then we invoke the principle settled in the case of Biscoe v. the Earl of Banbury,

1 Cha. Cas. 287, and in Willis *v.* Bucher, 2 Binney, 466; to wit, that it was *crassa negligentia* in him not to have examined into the extent of interest owned by Madame Gayoso, for he had at least fair notice that there was some conveyance to her, and it was in his power to ascertain the extent of her interests. Minor kept the patent safe, and exhibited it to the commissioners; but he carefully kept back, and yet keeps back, the deed or instrument of writing which accompanied the patent, and by which Gayoso is pretended to have divested himself of title in favor of Margaret Watts.

V. Whether this be a proper case for chancery jurisdiction, or whether the demurrer ought to have been sustained, is a question which I could wish some other person, more conversant with the doctrines and practice of courts of equity than I am, could present to the court. But it does appear to me, that, although the plaintiff exhibits a legal title, on which he might recover in an action of ejectment, yet the proceedings of Minor during the infancy of Fernando were such, in procuring a certificate in his own name, as to raise an implied trust; and that the show of title thus acquired by him throws such a shade over the title of the complainant, as on both grounds to authorize his appeal to a court of equity, and that a court of law could not give him full and complete remedy. I rely on the principles settled in the case of Gaines et ux. *v.* Chew et al., 2 Howard, cited above.

*Mr. Campbell,* for the appellees, relied upon the following points.

1st. That the appellants' claim, as the heirs of Manuel Gayoso through Fernando Gayoso, fails, because Fernando was not born in wedlock. His birth took place on the 14th of July, 1797, in Natchez, and his parents were not married till the 10th of December following, in another territory.

2d. That even if Fernando be legitimate, his father, Manuel, was an alien, and could not transmit aught to his son by descent. Orr *v.* Hodgson, 4 Wheat. 460; Inglis *v.* The Trustees, &c., 3 Pet. 121.

3d. That even if legitimate, and capable to take by descent from his father, he is barred by limitations. Statute of Mississippi, 1818; Peyton *v.* Stith, 5 Pet. 494.

4th. That even conceding all the foregoing points in favor of the appellants, the certificate of confirmation concludes all legal and equitable rights existing anterior to its date, and vests an indefeasible title at law and in equity in the appellees, which has since been recognized by Congress. Grand Gulf Bank *v.* Bryan, 8 Smedes & Marsh. 234; Ross *v.* Barland, 1 Pet. 667;

Hickey v. Stewart, 3 How. 760; United States v. King, 3 How. 787; Act of 1803, ch. 27, § 5 (2 Stat. at Large, 229); 9 How. 170.

5th. That even if the certificate be not conclusive, and be impeachable for fraud, there is no proof of any fraud in obtaining it, or otherwise.

Mr. Justice McLEAN delivered the opinion of the court.

This case involves the title to a tract of one thousand arpents of land adjoining the city of Natchez.

On the 10th of September, 1794, a grant was obtained for this land from the Baron de Carondelet, Governor-General of Louisiana, by Manuel Gayoso de Lemos, who resided in Natchez. He settled on Margaret Watts, his future wife, the same tract of land, and indorsed upon the grant that it was transferred to her. They were afterwards married, and, with the view to secure to his wife a military pension, the permission of the king of Spain was subsequently obtained. In 1797, some time after the marriage, the nuptial benediction was pronounced by the Bishop of Havana, in New Orleans. In 1797 Madame Gayoso had a son, who was named Fernando. In 1798 Gayoso succeeded the Baron de Carondelet as Governor-General of Louisiana, and removed to New Orleans, where he died in 1799, his wife and son surviving him.

On the 10th of August, 1799, for the consideration of five thousand dollars, Madame Gayoso conveyed the premises, with all the improvements thereon, to Daniel Clark, junior. And on the 15th of August, 1800, Daniel Clark, for the consideration of ten thousand dollars, conveyed the same to William Lintot. In this deed the original grant is referred to, and the plat. And it states, "whereas by an instrument of writing which accompanies this, dated the 12th of February, 1795, the said Don Manuel Gayoso de Lemos did, for certain considerations therein recited, convey the said land, with all the appurtenances, to Margaret Watts; and whereas the said Margaret Watts, now the widow of the said Don Manuel Gayoso de Lemos, by her deed dated the 10th of August, 1799, which accompanies this, did convey the said land to Daniel Clark," &c. On the 15th of November, 1800, William Lintot, for the consideration of the sum of ten thou and dollars, conveyed the same land, with the same recitals, to Stephen Minor, the ancestor of the defendants.

In 1805, this title having been presented to the board of commissioners west of Pearl River, by Minor, under the act of Congress of 1803, regulating the grants of land, &c., south of the State of Tennessee, was confirmed for seven hundred

54*

and fifty-six arpents. The possession of the land is shown from the original grant to Gayoso under the titles stated.

The complainant, Fernando Gayoso de Lemos, claims the land as the son and only heir of Don Manuel Gayoso de Lemos. In his bill he represents that, after the death of his father, his mother intermarried with one James Stelle, in 1805, and that she died in the year 1829. That the defendant Minor, being in possession of the evidences of title, in fraud of his rights, he being an infant, procured from the board of commissioners a certificate for the land. That in 1815 Stephen Minor departed this life, and left Katharine Minor, his wife, a devisee and trustee of all his estate, and also executrix, and John Minor executor of his last will and testament. That conveyances were executed to the defendants, all of whom had notice of the claim of the complainant. A decree for a conveyance of the land is prayed for, &c. Fernando Gayoso having died, his heirs were made parties.

On the part of the complainant, it is contended that, the original grant for the land under the Spanish government being unconditional, no confirmation of it was required by the United States. That the treaty protected such a title, and that Congress by the act of 1803 could not have intended to interfere with absolute grants, but such claims only as required confirmation by the Spanish authority. And it is urged that Spain, being in possession of the country, and exercising a government *de facto* over it, had the power to grant lands. That the civil law applies as well to the transfer of the land alleged to have been made by Don Manuel Gayoso to Margaret Watts, as to the original grant.

These positions were sustained in the argument by much research and ability, but we are precluded from taking this view by the political action of the government, and the decisions heretofore pronounced by this tribunal.

On the 27th of October, 1795, a treaty was made with Spain, which acknowledged the southern limits of the United States to extend to the thirty-first degree of north latitude. The territory belonged to the State of Georgia, but by deed bearing date the 24th of April, 1802, she ceded it to the United States. In the deed of cession it was stipulated "that all persons who, on the 27th of October, 1795, were actual settlers within the territory thus ceded, shall be confirmed in all the grants legally and fully executed prior to that day, by the former British government, or the government of Spain," &c. The land was in possession of Gayoso at the time specified, and the grant having been "legally and fully executed," under the government of Spain, it was included in the deed of ces-

sion. By the fifth section of the act of the 3d of March, 1803, above referred to, it is provided, " that every person claiming lands by virtue of any British grant," &c., " or of the articles of agreement and cession between the United States and the State of Georgia, shall, before the last day of March, 1804, deliver to the register of the land-office, within whose district the land may be, a notice in writing, stating the nature and extent of his claims, together with a plat of the tract or tracts claimed, and shall also, on or before that day, deliver to the said register, for the purpose of being recorded, every grant," &c.; and on failure to do so, " all his right, so far as the same is derived from the above-mentioned articles of agreement," &c., " shall become void, and for ever thereafter be barred"; and it is declared that such deed, &c., which shall not be recorded, shall not be evidence in any court of the United States against any grant under the same.

The sixth section provides, " that, when it shall appear to the board that the claimant is entitled to a tract of land under the articles of agreement and cession with Georgia aforesaid, in virtue of a British or Spanish grant legally and fully executed, they shall give a certificate thereof, describing the tract of land and the grant, and stating that the claimant is confirmed in his title thereto by virtue of the said articles; which certificate, being recorded by the register of the land-office," who shall record it, " shall amount to a relinquishment for ever on the part of the United States." An act supplementary to the above was passed on the 27th of March, 1804, providing for the survey of lands claimed by Spanish grants, but it has no direct bearing on the questions before us.

The treaty with Spain established a disputed boundary; there was no cession of territory. The jurisdiction exercised by Spain over the country north of the thirty-first degree of north latitude was not claimed or occupied by force of arms, against an adversary power; but it was a naked possession, under a misapprehension of right. In such a case, Georgia, within whose sovereignty the country was situated, was not bound to recognize the grants or other evidence of title by the Spanish government.

In the case of Pool *v.* Fleeger, 11 Peters, 210, where North Carolina and Tennessee made grants for lands within the territory of Virginia, through a mistake of the boundary line, the court say, " It is perfectly clear that the grants under which the defendants claim, being beyond the boundary of Tennessee, were inoperative." The same doctrine has been held in relation to the Spanish grants north of the thirty-first degree of north latitude, in Henderson *v.* Poindexter, 12 Wheat. 530; Lessee

of Hickey et al. v. Stewart et al., 3 How. 756; La Roche et al. v. Jones, 9 How. 170.

The title in question belongs to a class which was recognized and made valid in the cession of the territory by Georgia to the United States. This act of Georgia, though voluntary, was just. It secured to the Spanish claimant a title, which, so far as he was concerned, had been acquired in good faith, but which was void for want of authority in the granting power. In requiring the holders of complete grants to present them and the plats of survey before commissioners, under the act of 1803, Congress carried out the compact with Georgia. In reference to such titles the words of the cession were, "they shall be confirmed." And although the forfeiture of the title, if not presented and recorded, was a rigorous provision, yet it was within the power of Congress. Until these titles were examined, and their boundaries ascertained, the government could not make a survey and sale of the lands to which there were no valid claims. It was therefore important, that all titles to which validity was given by the cession and by acts of Congress should be placed upon the public records, under the sanction or rejection of a competent board of commissioners.

The ground on which the complainants chiefly rely for a decree is a presumed defect in the conveyance from the widow of Gayoso to Clark.

The indorsement upon the original grant by Don Manuel Gayoso, that he had conveyed the property to Margaret Watts, referred to an instrument other than that indorsed on the grant. And we find in the deed from Clark to Lintot, and also in the deed from Lintot to Minor, there is a reference to that instrument, reciting its date and that it accompanied the deeds executed. And these conveyances were sanctioned by the solemn act of the commissioners when they confirmed the title to Minor. Under this title there has been a continuous possession of fifty years. The consideration paid by Clark satisfactorily shows that he supposed himself to have acquired a complete title to the land. Under these circumstances, if the decision of the case turned upon the legal title, such title might well be presumed, whether the conveyances were executed under the laws of Spain or of Georgia.

It may be presumed that in the conveyance to Miss Watts, which has by some means been lost, the forms of the civil law were pursued, as the common law was not adopted in any part of the Spanish dominions. But validity was imparted to such conveyance by the compact with Georgia, the act of 1803, and the proceedings under that act, the same as to the

original grant. There is no probability that Gayoso by the conveyance vested no higher interest than might have been claimed by Miss Watts after her marriage with him under the civil law. The fact of his having executed to her a conveyance, of which there is proof, may well justify the inference, that he gave her an absolute title to the land.

But there is another and a more conclusive view of the case. If it be admitted that the complainants may go behind the confirmation of the title by the commissioners, there is nothing on which they can rest but a paramount equity. And what is the nature of that equity as made out in the proof? The heirship of the complainants may be admitted as proved, but there is no other proof of equity than a supposition unsustained by facts, and contradicted by strong circumstances, that a life estate only in the premises was vested in Madame Gayoso. This supposition is refuted by the only rational motive which can be presumed to have induced Don Manuel Gayoso to make the conveyance to his intended wife; by the fact, that, after his death, the widow sold the premises for a full consideration, and saw them occupied by persons claiming them in fee for thirty years, until her death, without setting up any claim thereto in behalf of her son, or informing him that he had a right to the premises after her decease. Under such circumstances, equity can give no relief to the complainants. The decree of the Circuit Court dismissing the bill is affirmed.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Southern District of Mississippi and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.