REESE et al. v. COBB.

(Court of Civil Appeals of Texas. Jan. 25, 1911. On Motion of Appellant for Rehearing, Feb. 22, 1911.)

1. LIMITATION OF ACTIONS (§ 44*)—REAL ESTATE—ACCRUAL—UNSETTLED BOUNDARY OF UNITED STATES.

The statute of limitations of Texas may not be invoked against title to land emanating from Texas, while the boundary between the United States and Mexico, as observed by the political authorities of the United States and Texas, left the land in Mexico, though the boundary line de jure placed the land within Texas.

[Ed. Note.—For other cases, see Limitation of Actions, Dec. Dig. § 44.*]

**2. EVIDENCE (§ 10*) — JUDICIAL NOTICE — BOUNDARIES.**

The courts will take judicial notice of the boundary line between the United States and Mexico as recognized by the political authorities of the United States and Texas, so that it is not necessary to plead, to defeat limitations based on possession while the land was treated as in Mexico, that the political authorities of the United States and Texas recognized a boundary between the United States and Mexico so as to leave the land in Mexico.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 9–14; Dec. Dig. § 10.*]

**3. CONSTITUTIONAL LAW (§ 68*) — JUDICIAL AUTHORITY—ACTION OF EXECUTIVE DEPARTMENT—EFFECT.**

Where the political authorities of the United States and Texas recognized a line between the United States and Texas while another line was the boundary line de jure, the courts must observe the boundary line as recognized, and they must on their own motion dismiss an action involving land left in Mexico under the boundary line as recognized.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 125–127; Dec. Dig. § 68.*]

**4. PUBLIC LANDS (§ 206*) — MEXICAN GRANT — BOUNDARIES.**

Where a grant made in 1790 was recognized and confirmed by Act Feb. 5, 1853 (Sp. Laws 1853, c. 6), to land described as commencing on the Rio Grande and up the Rio Grande from a designated point, and it appeared that the Rio Grande subsequently changed its course so as to leave the land on the Mexican side of the river, and the state made no other grant, and subsequently the International Boundary Commission ascertained the original position of the river, the boundary of the grant was the Rio Grande, wherever that proved to be.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 651; Dec. Dig. § 206.*]

**5. PUBLIC LANDS (§ 176*) — ANCIENT GRANTS — BOUNDARIES.**

Where an ancient grant of land was made to the people of a town, the act of the corporate authorities of the town in adopting a boundary of the grant did not estop the town from claiming beyond that boundary, provided the grant extended beyond it, in favor of possessors deriving no title from the state.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 176.*]

**6. MUNICIPAL CORPORATIONS (§ 224*) — ACQUISITION OF PROPERTY—RIGHTS ACQUIRED.**

A grant of land to the inhabitants of a town inures to the town in its corporate capacity, so that, when the inhabitants incorporate as a town, the land may be controlled and disposed of by the corporate authorities.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 623–625; Dec. Dig. § 224.*]

**7. MUNICIPAL CORPORATIONS (§ 225*) — REAL ESTATE—RIGHTS ACQUIRED.**

Sayles' Ann. Civ. St. 1897, art. 587, providing that an incorporated town or village may hold and dispose of real and personal property within its limits, does not apply to land that had been acquired by the inhabitants by grant from the state, and the town may convey lands thus acquired, situated beyond its corporate limits.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 225.*]

**8. MUNICIPAL CORPORATIONS (§ 225*) — POWERS—STATUTES.**

The Legislature in granting corporate powers to the inhabitants of a community may limit the corporate functions to the extent of depriving the inhabitants of the power to convey through the corporate body lands that had been granted them by the state.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 623; Dec. Dig. § 225.*]

**9. PUBLIC LANDS (§ 203*)—MEXICAN GRANTS —VALIDITY.**

Title emanating from the republic of Mexico to land legally a part of Texas de jure since the treaty of Guadalupe Hidalgo are of no effect.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 638–648; Dec. Dig. § 203.*]

*On Motion by Appellant for Rehearing.*

**10. PUBLIC LANDS (§ 206*)—MEXICAN GRANTS —BOUNDARIES.**

Where the state determined that the Rio Grande forming the boundary between Texas and Mexico was in the dry bed of the river, the state, recognizing and confirming an ancient grant to land bounded by the river, made the river forming the boundary between Texas and Mexico the boundary of the land.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 651–653; Dec. Dig. § 206.*]

Appeal from District Court, El Paso County; A. M. Walthall, Judge.

Action by Zach Lamar Cobb against August Reese and others. From a judgment for plaintiff, defendants appeal. Affirmed.

Patterson, Buckler & Woodson and W. B Brack, for appellants. Seymour Thurmond for appellee.

JAMES, C. J. The third amended petition of appellee, Cobb, was one in trespass to try title to a tract containing 285.66 acres situated on the "Island" on the south side of the present channel of the Rio Grande river, and alleged to be a part of the San Elizario grant in El Paso county, Tex. Defendants by a second amended answer pleaded not guilty, etc.; that the land was never a part of the San Elizario grant; that defendants have had continuous adverse possession of same for over 40 years; that since 1853 it has ever been recognized by the inhabitants of the town of San Elizario as being south and west of the boundary line of said grant; that ever since 1853, and since the patent to the San Elizario grant was made, and ever since the town of San Elizario was organized by the special act of the Legislature in 1871 (Sp. Laws 1871, c. 42), the inhabitants of San Elizario and the town of San Elizario and all persons interested have acquiesced in the fact that said land was not a part of the said grant, and that the grant did not extend over said land, and that defendants in their purchases of said land relied on said facts, and plaintiff is precluded and estopped from claiming said land as a part of the grant, and defendants also pleaded the statute of limitations of 10 years. After the evidence was concluded, the court directed a verdict in favor of plaintiff.

The first question which we shall refer to is whether or not the court should have submitted the case to the jury on the issue of limitations. It is claimed by appellee that the evidence was not sufficient to make a case of continuous adverse possession as our statute requires. But the view we take of that issue, as it is presented here, renders it unnecessary to notice that particular question. All the evidence taken shows that during all the time with reference to which defendant claims to have adversely possessed and used this land the boundary line of the two governments, as recognized and observed by the political authorities of the United States and the state of Texas, left the land in controversy within the territory over which Mexico exercised dominion. This condition relating to the extent of territorial jurisdiction actually exercised by the American authorities, both state and federal, arose from a change in the bed of the river at an early date, admitted to be in 1857. It does not matter how this condition arose, or that the boundary line de jure, governed by the position of the river as it was when the treaty was made between the United States and Mexico, was in fact further west and entitled Texas to this land. The fact is that the state of Texas and the United States never in fact extended, nor sought to extend, their governmental authority over the territory in question, and that the Mexican government did in all things retain and exercise its jurisdiction over the territory until March or April, 1897, when the boundary between the two countries was, by the International Boundary Commission of the two countries, ascertained and fixed by monuments along a former bed of the river, thereby establishing this land on the American side. During all the years prior to the work of said commission, the law of Mexico prevailed and was exercised fully over this territory; and the river as it ran was the territorial limit of the governmental jurisdiction observed and exercised by the state of Texas and of the United States. The boundary was a matter for the political authorities, and, so long as it was an unsettled question between the two federal governments and so long as the Mexican government, without question, was permitted to continue to govern the territory, and actually did so, it is clear that the courts of the country were powerless to assert their jurisdiction over that territory, or to enforce its decrees therein. This being so, the statutes of limitation of Texas could not be invoked by possessors of the land against title thereto emanating from the state of Texas, the sovereignty to which the land de jure belonged. This follows from the fact that as conditions stood the courts of Texas were without power to give relief in any action of a possessory character.

Appellants' counsel in oral argument, although not in their brief, called attention to the fact that plaintiff did not in reply to the plea of limitations plead the above conditions. We are of opinion that they were a proper subject of judicial notice, and therefore it was unnecessary to plead same. It was undisputed that until the action of the International Boundary Commission in 1897, and during all the time of the adverse possession claimed in this case, the Rio Grande, as the boundary line between Texas and Mexico, was recognized and acted upon by the two governments as being the channel to the east of the tract in question, that the Mexican government exercised dominion west of that channel, and the government of the United States and of the state of Texas refrained from asserting and exercising dominion beyond that channel. The courts in such matters regard and follow the lead of the political department of its government. United States v. Arredondo, 6 Pet. 691, 8 L. Ed. 547; Garcia v. Lee, 12 Pet. 511, 9 L. Ed. 1176. This de facto condition, while it existed, it was the duty of the district court of El Paso county to observe, which necessarily involves judicial notice of the fact. State v. Dunwell, 3 R. I. 127. We think that it is clear that while said conditions prevailed a suit involving title to land described as lying beyond that recognized boundary filed in the district court of El Paso county would upon the court's own initiative and in the performance of its duty not have been entertained.

The following are the material facts developed by the testimony as to title: By the act of February 5, 1853 (Sp. Laws 1853, c. 6), "the grant made to the people of Presidio de San Elizario" in the year 1790 was recognized and confirmed to land described as commencing on Rio Grande at line between Socorro and San Elizario; thence easterly to hills bordering on east bank of Rio Viejo; thence southeasterly with said hills to point where Rio Viejo empties into the Rio Grande; thence up said Rio Grande from the mouth of Rio Viejo to the place of beginning. The patent dated March 8, 1853, granted and relinquished to the inhabitants of the town of Presidio de San Elizario all the right and title in and to the land described in the above act, and describing same accordingly. By special act of the Legislature in 1871 the town of San Elizario was incorporated, and the limits were fixed identical with the grant, as confirmed. Sp. Laws 1871, c. 42. This act prescribed the condition upon which the incorporated town might deed any part of the grant. The situation remained until the act was repealed by the act of 1891 (Sp. Laws 1891, c. 11); and at the same session in 1891 another act (Sp. Laws 1891, c. 4) was passed validating deeds that had been made by the town of San Elizario after an attempt to incorporate under the general law, and reciting that the grant of the body of land had been made to the inhabitants of the

town of San Elizario, and that they had before that time subdivided the land and conveyed the same by deed. In May, 1893, the town of San Elizario, by virtue of an election held in the town of San Elizario, was incorporated under the provisions of chapter 2, tit. 18, Rev. St. 1895, with corporate limits reduced to a parcel of land about 4,000 varas by 4,800 varas in the northwestern portion of the grant. Commencing at dividing line between Socorro and San Elizario at Rio Grande river, thence with said lines north 72½° E., 4,000 varas, to a point where said line intersects or crosses the Acequia Roderiqua; thence south 20° E., about 4,800 varas, to the northwest corner of survey 39 Wingo's map; thence south 67½° W., about 3,800 varas, to the bank of the Rio Grande; thence up the Rio Grande, with its meanderings, to the place of beginning, to be known as the town of San Elizario. This presumably and in fact embraced what was known as the town of San Elizario. This corporation was abolished by an election held in April, 1897. In November, 1906, the present town of San Elizario was incorporated under the provisions of title 18, c. 11, art. 581, Rev. St. 1895, with limits comprising two square miles, said limits including the town as theretofore known as San Elizario; the limits being defined as follows: One mile north from the Plaza, one mile south from the Plaza, one-half mile east from the Plaza, and one-half mile west from the Plaza of said town. The land in controversy was outside of said limits. It was admitted that there was no outstanding title to the land involved in this suit in the state of Texas. The present corporation conveyed this land to appellee Cobb on September 21, 1908. He also had procured a judgment of the district court of El Paso county for the land against said corporation. This last-named item of evidence we think would not operate to pass title, if the incorporated town did not in fact have power to hold or dispose of the land, which is one of appellants' contentions.

The question first to consider is whether or not the land in question was within what was granted by the patent. We conclude that it was. The western boundary of the grant was the Rio Grande river, wherever that proved to be. The Rio Grande called for in the patent was the boundary of the state, and said river for all the distance along this grant was where it had always been, except for a change along a short distance which occurred in 1857, throwing this piece of land on the Mexican side apparently. It was admitted by plaintiff, and is cited by appellants as a fact, that the Rio Grande changed to its present course in 1857. If so, it is evident that the patent in 1853 extended west of the present channel. It was also admitted at the trial that there is no outstanding title in the state to the land involved in this suit. No other grant, or attempted grant,

by the state of Texas to this tract was shown. The International Boundary Commission ascertained the original position of the river to be coincident with the western boundary of the tract in question, and monumented the international boundary accordingly.

The next question is whether or not plaintiff, Cobb, acquired title to this tract by his deed from the town of San Elizario through its present incorporation. The act of 1871, incorporating the town of San Elizario, enacted that the citizens of the town of San Elizario in the county of El Paso be and is hereby declared a body corporate; that the corporate limits shall include all within certain boundaries, describing same as in the patent. The act, by section 24 thereof, recognized the grant as the property of the town of San Elizario and authorized conveyances, but imposed on the corporation certain restrictions in this respect. It recognized the title to be in the town of San Elizario. The act and its provisions and restrictions came to an end upon its repeal in 1891. 10 Gammil's Laws, p. 252. Just previous to this repealing act there was passed a validating act, validating deeds made by the town of San Elizario while acting under the general incorporation laws of the state, the act reciting that the state had granted by patent to the inhabitants of the town of San Elizario a body of land, and said inhabitants had for many years ignored the special charter, and had organized, in pursuance of the general incorporation laws, a municipal corporation and subdivided the land into small parcels and conveyed same by deed, and the same are now in good faith held and owned by hundreds of persons, etc. This act was evidently passed upon the theory that, while the charter granted by the special act was in force, the town had attempted to incorporate under the general law of 1858 (Laws 1858, c. 61), and had made conveyances under that incorporation, which was unlawful, and that such conveyances required validation for that reason.

As before stated, the town of San Elizario, after having been without incorporation for 12 years, became incorporated under the Revised Statutes in 1893, with restricted limits as aforesaid, which corporation was abolished by an election held in 1897, and then, in 1906, the present corporation was organized with similar restricted limits, both of these organizations including the town, the latter one expressly giving the boundaries from the Plaza which was the center of the town of San Elizario. It appears from the testimony that the town as incorporated in 1871 by said special act afterwards located its west line as being where the river then and now runs, subdivided its lands to that boundary, and no further west, and sold same up to that line. This action of the

corporate authorities did not, in our opinion, have the effect of estopping the town, or the grantee in the patent, from claiming west of that boundary, if in fact the grant proved to extend west of it, in favor of possessors of the land who derive no title from the state. If the state had asserted claim to land west of that boundary and had granted it to third persons, the concurring action of the town in respect to the boundary of its land might have given rise to equities which would be recognized. Nothing of that kind appears. We are of opinion that a grant of land to the inhabitants of a town inures to the town in its corporate capacity, in the sense that, when the inhabitants thereof incorporate as a town, it is to be held, controlled, and disposed of by the corporate authorities. It is impossible to conceive how, otherwise, considering the uncertainty of the grantee, it could in the nature of things be disposed of. This seems to have been the idea of the Legislature as is indicated by the act of 1858, providing for the incorporation of cities and towns, section 43 thereof (4 Gammil's Laws, p. 946) which reads: "That the act of incorporation under the provisions of this act shall not be construed as in any manner to affect the titles to land heretofore granted by the government to the inhabitants of any town, but the lands so granted shall continue to be held and disposed of by the corporate authorities so created, for the use and benefit of the inhabitants of said town, for the purposes for which they were originally granted." The grant in question was unrestricted as to the disposition of the land. It is true that the special act of 1871 imposed ·certain limitations on the disposition of the grant, but those limitations disappeared when the act was repealed. The repeal of said act in 1891 left the title to any unsold remnant of this grant in the inhabitants of the town of San Elizario just as it had been prior to 1871, and any such remnant the inhabitants of the town were capable of conveying through the corporate authorities of any subsequent incorporation of the town; and we conclude in this regard that their power to sell and convey through the corporation organized under the present general law existed, unless the exercise of such power is expressly denied by its provisions. The provision which appellant invokes is article 587, Sayles' Ann. Civ. St. 1897, which reads: "When the entry mentioned in the preceding article has been made the town shall be invested with all the rights incident to such corporations under this chapter and shall have power to sue and be sued, plead and be impleaded, and to hold and dispose of real and personal property; provided such real property is situated within the limits of the corporation." We are of opinion that this was not intended to apply to land that had already been by the inhabitants acquired by grant from the state. Unless such intention expressly or clearly appears from the act, it ought not to be attributed to the Legislature, particularly in view of the fact that in every enactment, so far as we know, dealing with communities to whom lands had been granted, the title of such communities in the corporation, when incorporated, has been recognized. The general act of 1858 providing for incorporation of communities, which was in force from 1858 until the adoption of the Revised Statutes of 1895, did so. The Revised Statutes on the subject of incorporating towns and cities do not in terms undertake to deal with the case of a community of inhabitants to whom the Legislature had made a grant of land, and·seems not to have had such a condition in view. But they deal with the case of a pre-existing corporation accepting its benefits and incorporating thereunder, and also with the case of a reincorporation under its provisions, and in each instance recognize the right of the new incorporation to succeed to all the property rights of the former one. Articles 383 and 616.

We recognize, of course, that in granting corporate powers to inhabitants of a community the Legislature would have the right to limit the exercise of the corporate functions, even to the extent of depriving the inhabitants of the power to convey, through the corporate body, lands that had been granted them by the state. But we are of opinion that, in enacting the article 587, the Legislature had in view communities as they are ordinarly conditioned, ·and not those very exceptional ones which may have had property granted them by the state; and, in enacting said article and providing that the corporation might hold and dispose of land within its limits, the Legislature had reference to real property to be acquired by the corporation, and not property that was already vested in the inhabitants forming the corporation. We reach the conclusion that the title to the land in question here and right of disposition thereof were in the inhabitants of the town of San Elizario, and that its corporate authorities had power to dispose of the same, or any remnant thereof, and that its deed to Cobb passed title. According to the undisputed facts, we think ·the court did not err in the peremptory instruction.

The sixth, seventh, and eleventh assignments of error, if sustained, would not affect the force and effect of plaintiff's deed from the town. All the other assignments of error are overruled as the necessary consequence of what is held in this opinion.

·The land involved has always been legally a part of the state of Texas de jure since the treaty of Guadalupe Hidalgo. Titles or claims thereto emanating from· the republic of Mexico since then are of no effect. Robinson v. Minor, 10 How. 628, 13 L. Ed. 568, Garcia v. Lee, 12 Pet. 511, 9 L. Ed. 1176,

Coffee v. Groover, 123 U. S. 1, 8 Sup. Ct. 1, 31 L. Ed. 51.

Judgment affirmed.

On Motion by Appellant for Rehearing.

There is a fact misstated in the opinion which we shall correct, using the plat attached hereto for illustration.

The plat shows the bed of the river since the change of its course in 1857. We were mistaken in stating that "it appears from the testimony that the town as incorporated in 1871 * * * afterwards located its west line as being where the river then and now runs, subdivided its lands to that boundary and no further west, and sold same up to that time." The fact is that the meandering line to the west of the above was the line, or dry bed of the river, up to which the town subdivided and sold its lands, and up to which the state of Texas on the east and the republic of Mexico

135 S.W.—15

on the west exercised authority. The parcel of land in dotted lines on the plat represents the tract in controversy, consisting of about 300 acres. Where the dotted line runs is also a dry bed of the river, and is where the Boundary Commission has fixed and monumented the true boundary line between the republics. What is stated in the opinion by way of conclusions applies equally to the fact as above set forth.

The patent describes the western boundary of the land as running from a point which was several miles south on the river from the land in question, "thence up said Rio Grande to the place of beginning," which was several miles north of it. This patent was issued conformably to the legislative confirmation of a grant to San Elizario by the Spanish government.

Appellant contends that the bed of the river as it ran in 1853 when the patent issued, if it can be identified, constitutes the western boundary of the land, and that, having introduced testimony which tended to show that the dry bed up to which the town afterwards subdivided and sold its land was in fact the then course of the river, the question should have been submitted to the jury.

We are of opinion that, if it be conceded that the river so ran in 1853, the state by its confirmation and patent intended to part with all land it had up to the Rio Grande river as said river constituted its boundary. The patent would leave no room for construction in this respect if it had called for "the Rio Grande river as it now runs." The Boundary Commission determined that the river as called for in the treaty (1848) was at this point in the dry bed on the west side of this tract, and shown by dotted line on the plat. This was the Rio Grande which was then and in 1853 the state boundary. It would be unreasonable under the circumstances to hold that the state contemplated any other than the river as it formed said boundary. We think the patent gave the town of San Elizario all the land to the Rio Grande river as that river constituted the state's boundary. We desire to add that it was not our intention to hold that the admission by defendants that there was no outstanding title in the state was an admission that the tract in question was embraced in the patent, nor that said admission affected defendant's right to have plaintiff show title from the state in himself.

The main opinion, considered with the corrections and the remarks herein, embodies our views concerning the rights of the parties with reference to this land.

The motion is overruled.