## COFFEE v. GROOVER.

ERROR TO THE SUPREME COURT OF THE STATE OF FLORIDA.

Argued April 20, 1887. — Decided October 17, 1887.

Grants of land made by a government, in territory over which it exercises political jurisdiction *de facto*, but which does not rightfully belong to it, are invalid as against the government to which the territory rightfully belongs.

Where a disputed boundary between two states is adjusted and settled. grants previously made by either state, of lands claimed by it, and over which it exercised political jurisdiction, but which, on the adjustment of the boundary, are found to be within the territory of the other state, are void, unless confirmed by the latter state; and such confirmation cannot affect the titles of the same lands previously granted by the latter state itself.

The boundary between Georgia and Florida was long in dispute; Georgia claiming to a line called Watson's line, and exercising political jurisdiction. and making grants of land to that line; whilst Florida claimed to a line called McNeil's line, further north than Watson's. Upon running the true line, as finally agreed upon by the two states, it was found to be further north than McNeil's line: — *Held*, 1, That the grant made by Georgia of the land in dispute, which was south of McNeil's line, though made whilst Georgia exercised the powers of government *de facto* over the territory there, was nevertheless void; 2, That the confirmation by Florida of the grants made by Georgia, did not invalidate or disturb the grant of the land in dispute previously made by itself.

The history of the Florida boundary stated.

VOL. CXXIII—1

EJECTMENT for lands in Madison County, Florida. Judgment for plaintiffs, which was affirmed by the Supreme Court of the state. This writ of error was sued out to review the judgment in affirmance. The case is stated in the opinion of the court.

*Mr. Angus Paterson* for plaintiff in error.

*Mr. C. W. Stevens* for defendant in error. *Mr. S. Pasco* was with him on the brief.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is an action of ejectment for ninety-seven acres of land in Madison County, Florida, situated near the boundary line between that state and Georgia. The plaintiffs were James M. Groover and others, heirs at law of Charles A. Groover, and now defendants in error; the defendant was Andrew J. Coffee, the present plaintiff in error. Judgment was first rendered by the court of first instance in favor of the defendant below; but being reversed by the Supreme Court of Florida, a new trial was had, and judgment was given for the plaintiffs, and affirmed by the Supreme Court. The last judgment of the Supreme Court is brought here for review on two grounds; first, that the matter in controversy had been tried and determined by the Circuit Court of the United States for the Northern District of Florida, in favor of the defendant, Coffee, in a suit between him and the executrix of Charles A. Groover, the ancestor under whom the plaintiffs claim title; secondly, on the ground that the defendant's title to the land in controversy was claimed by him under a grant made by the United States to the State of Florida, and by the State of Florida to the defendant, which title was set aside by the state court in favor of the plaintiff's title derived under a conflicting grant from the State of Georgia.

The first ground of error is not raised on the record in such a manner as to avail the defendant. The matter of defence involved therein was set up by two pleas: first, a plea of former recovery; and, secondly, a plea to the jurisdiction

of the court. These pleas were overruled on demurrer, but for what reason is not stated. The Supreme Court of Florida, however, in its opinion, very properly says: " In ejectment all legal defences may be made under the plea of not guilty, and the special denials mentioned in the statute. McClelland's Dig. 481. Special pleas of matter affecting the legal title, or in estoppel, only encumber the record and tend to embarrassment. *Wade* v. *Doyle*, 17 Fla. 522 ; *Neale* v. *Spooner*, June Term, 1883 [20 Fla. 38]. They should be struck out by the court *sua sponte*, or on motion, or on demurrer, because they are not proper pleas ; but a judgment sustaining a demurrer will not preclude proof, on the trial, of the facts so improperly pleaded." *Coffee* v. *Groover*, 20 Fla. 64, 78. The pleas being overruled, no attempt was made, on the trial, to set up the defence by proof of the former judgment relied on. This branch of the case, therefore, may be laid out of view.

. The second ground for reversal is stated in duplicate form in the assignment of errors, as follows, to wit:

(1) " In the record and proceedings aforesaid there is manifest error, to wit: That the Supreme Court of the State of Florida in the above stated cause decided that a grant for land issued by the State of Georgia is superior to a patent issued by the United States for the same land, the said land being situate within the territorial limits of the State of Florida."

(2) " There is manifest error in this, to wit, that the Supreme Court of the State of Florida in the above stated cause, [as] by the record aforesaid it appears, held that the plaintiff in error should be ousted from certain lands embraced within the territory of the State of Florida, he holding title through the State of Florida derived from the United States, and that the defendants in error should be put in possession, they claiming under a grant issued by the State of Georgia."

By § 709 of the Revised Statutes, where the decision of the state court is against a title claimed under the Constitution, or any treaty or statute of, or a commission held, or authority exercised under, the United States, this court has jurisdiction to review the decision. We think it will sufficiently appear

from the facts of the present case, and the points of law arising thereon, that it satisfies the conditions of the section. The title claimed by the defendant rested, not only on a grant of the United States, but on a delimitation of territory under a treaty between the United States and Spain.

The case is one of conflicting grants of the same land lying near the boundary line between Georgia and Florida. The fact that the land in controversy was covered by both grants was settled by the jury. It is conceded to lie within the bounds of Florida according to the line recently agreed upon by the two States.

The occasion of conflicting grants being made was the uncertain location, at the time, of the true boundary line referred to, and the fact that Georgia claimed one line and the United States and Florida claimed another.

The plaintiffs, to maintain their title to the land in dispute, gave in evidence, on the trial, two patents from the State of Georgia to one James Groover, each bearing date the 1st day of January, 1842; one for $226\frac{2}{10}$ acres of land, described as situate in the fifteenth district of Irwin County (Georgia), and known and distinguished in the plan of said district by the number 199, and having the shape, form, and marks shown by a plat annexed; the other patent being for $250\frac{2}{10}$ acres of land, situate in the same district and county, known and distinguished by the number 200, and having the shape, form, and marks shown by a plat annexed. The plats showed that the two lots joined each other east and west, and that they were both bounded on the south by a common line called on the plats "*Florida line*"; and it was testified that the line thus marked on the plats was a line known as the "Watson line." Mesne conveyances were then given in evidence showing that said lots were conveyed by James Groover to Thomas A. Groover by deed dated December 31st, 1855; and by Thomas A. Groover to Charles A. Groover by deed dated July 8th, 1860; and it was further shown that Charles A. Groover died in 1866, and that the plaintiffs were his heirs at law. Evidence was also given tending to show that the said patentee and grantees respectively had possession of said lands under and

in conformity with their said titles until the plaintiffs were ousted by the defendant in 1876.

Evidence was further given to show that another line, called the "McNeil line," ran about 14 chains north of the Watson line and parallel thereto, and that the land in controversy lay between the said two lines, having the Watson line on the south and the McNeil line on the north. Also, that a third line, called the "Orr and Whitner line," ran still farther north than either of the aforesaid lines, which Orr and Whitner line was conceded to be the boundary line between the States of Georgia and Florida, as recently fixed by mutual agreement between the two States, by certain laws and resolutions of their respective legislatures, confirmed by act of Congress.

The plaintiffs also introduced evidence tending to show that the Watson line was formerly considered the State line between Georgia and Florida; that Georgians worked the Georgia roads to the Watson line, and Floridians worked the Florida roads to that line; that as far back as one of the witnesses could remember, he being for many years a lawyer and judge in one of the border counties of Georgia, that State had claimed and exercised jurisdiction to the Watson line, until the Orr and Whitner line was agreed upon as the boundary between the two States; that the people living north of the Watson line did jury duty and voted in Georgia; that the wills of people dying there were probated in the Georgia courts, and their estates were administered upon in those courts; that the Georgia courts took jurisdiction of offences committed as far south as the Watson line, and tried cases in which people living there were interested; that the officers of the Georgia courts executed writs as far south as that line; that persons were tried in Georgia for offences committed between that line and the Orr and Whitner line. And, on the other hand, as correctly stated by the Supreme Court of Florida in its opinion, there is nothing in the record, nor in the history of the government of the Territory or of the State of Florida, showing that the authorities of the latter exercised any of the powers of government north of the

Watson line prior to the said settlement of the boundary between the two States.

The defend .nt, to maintain the issue on his part, gave in evidence, first, a certified copy of a patent from the United States to the State of Florida, bearing date July 6th, 1857, issued under and in pursuance of the act approved September 28th, 1850, known as the act for granting to certain states the "swamp and overflowed lands" therein; by which patent there was granted to said State, as swamp and overflowed lands, certain designated fractional sections of land, amongst others "the whole of fractional section 29," in township ·3 north, range 9 east; which fractional section was proved to be bounded on the north by McNeil's line, and to include the land in controversy. The defendant also produced in evidence a certificate of sale issued by the register of public lands for the State of Florida to one McCall and one Stripling for said fractional section 29, and other land named in said patent, which certificate bore date September 2d, 1857, and acknowledged the receipt of one hundred dollars in cash, and of certain bonds for the remainder of the purchase money of said lands, as provided by the land laws of Florida. The defendant further gave in evidence a deed from McCall and Stripling to himself, bearing date November 12th, 1858, conveying to him all the lands included in said certificate of sale, with a covenant that they were free from incumbrances; also a deed of grant and conveyance of the same lands to the defendant from the Trustees of the Internal Improvement Fund of the State of Florida — the proper authority for that purpose — which last deed bore date September 12th, 1874. The defendant, being sworn as a witness, testified that McCall and Stripling paid all the purchase money for the lands to the State; but that the certificate was lost, and he, the defendant, afterwards made proof of it, and had the Trustees of the Improvement Fund make him a deed: but that the original receipt had since been found. He also testified that he had lived near the Georgia line for over forty years and never heard of the Watson line until about ten or twelve years ago. He worked the public roads up to the McNeil line, and the

Georgians worked their roads down to the McNeil line and no further; that the McNeil line was understood by citizens living near the line in both states to be the boundary line between the two states.

The defendant also gave in evidence the testimony of one Lanier, county surveyor of Madison County, Florida, who testified that he had surveyed the lands in controversy, and gave it as his opinion that the plats of land annexed to the plaintiffs' grants did not cover the said land, not having marks thereon for ponds, swamps and streams which he found on the premises; that the Watson line at the place in controversy runs through a large swamp not shown in said plats; that, until the establishment of the Orr and Whitner line, the McNeil line was always considered as the boundary line between Georgia and Florida; that he had frequently surveyed on the Georgia line, and always surveyed to the McNeil line; that he never heard of the Watson line until the controversy that led to this suit.

The court charged the jury that if they believed from the evidence that the State of Georgia, anterior to the year 1842, considered the land in controversy within her territorial limits, and incorporated within one of her counties, over which the authorities of said State exercised the usual powers of government; and that in 1842 the Governor of Georgia granted the identical lands in controversy to James Groover; and that said James Groover conveyed the same lands to Thomas A. Groover in 1855; and that said Thomas A. Groover conveyed the same lands to Charles A. Groover in 1860; and that said Charles A. Groover was dead, and that the plaintiffs were his heirs — then they must find for the plaintiffs: — But that if the evidence failed to induce the jury to believe that the lands sued for were the same as those described in the said grants and conveyances; or that the Georgia grants included the lands to the Watson line, they must find for the defendant.

Under this charge the jury found for the plaintiffs, thus establishing the fact that Georgia, anterior to 1842, did claim jurisdiction to the Watson line, and that the lands in controversy adjoining that line were included in the grant of Georgia to James Groover in 1842.

The Supreme Court of Florida sustained the charge of the court below, it being in accordance with its own opinion given when the case was first before it, as reported in 19 Fla. 61. The position assumed is, that grants in a disputed territory, by a government exercising therein sovereign jurisdiction *de facto*, are valid and to be sustained, notwithstanding that, by a subsequent settlement of boundaries, the disputed territory is conceded to the other contesting sovereign. Georgia, undoubtedly, at the time of the grant to James Groover, exercised the powers of government *de facto* over the territory in which the land in controversy was situated; and it is assumed by the Supreme Court of Florida that the boundary line subsequently agreed upon, by which said land was conceded to lie in the State of Florida, was a mere arbitrary line, adopted by way of compromise, and was never acknowledged to be the true legal line established by previous treaties and laws. The argument is, that, whatever may be the law with regard to grants made by a government clearly beyond its lawful boundaries and jurisdiction, it is certain that grants made within its jurisdiction, being lawful when made, are not invalidated by a subsequent cession of the territory to another sovereign; because, in such case, the rights of sovereignty only, and not those of private property, are changed. It is then assumed that, in cases of disputed boundary, where a line is finally fixed by compromise, the portions of territory previously possessed by either of the contracting parties, and conceded by the adopted line to the other, are to be regarded and treated as ceded territory, and not as territory that always really belonged to the sovereign who gets it by the compromise. The Supreme Court of Florida, speaking of the decision of the lower court, (which it affirmed,) says: "What they did decide was, that grants by a government *de facto* of parts of a disputed territory in its possession are valid against the State which had the right, *De la Croix* v. *Chamberlain*, 12 Wheat. 599, 600; and that, when a territory is acquired by treaty, cession, or conquest, the rights of the inhabitants to property are respected and sacred. *Rhode Island* v. *Massachusetts*, 12 Pet. 657, 749; 4 How. 591, 639; *United States* v.

*Clarke,* 8 Pet. 436, 445. And the principle applies to the states of this Union. *Poole* v. *Fleeger,* 11 Pet. 185, 209. In the latter case, the court says (p. 210): 'Although, in the compact, Walker's line is agreed to be in future the boundary between the two States, it is not so established as having been for the past the true and rightful boundary.' We decided this to be the rule in the present case when it was before us on the former appeal, 19 Fla. 61, and the case was tried the second time under the influence of the opinion and judgment of this court. We find no reason for modifying that judgment, and the error assigned is not sustained." *Coffee* v. *Groover,* 20 Fla. 64, 81.

Whether this view of the case thus taken by the Supreme Court of Florida is the correct one, regard being had not only to the facts found by the jury, but also to the treaties and acts of the Federal government, as well as of Georgia, in regard to the line in question; and whether the rule of law relied on by the court is a sound one, and rightly applicable to the case in hand, are the questions to be determined.

It is no doubt the received doctrine, that in cases of ceded or conquered territory, the rights of private property in lands are respected. Grants made by the former government, being rightful when made, are not usually disturbed. Allegiance is transferred from one government to the other without any subversion of property. This doctrine has been laid down very broadly on several occasions by this court, — particularly in cases arising upon grants of land made by the Spanish and other governments in Louisiana and Florida before those countries were ceded to the United States. It is true that the property rights of the people, in those cases, were protected by stipulations in the treaties of cession, as is usual in such treaties; but the court took broader ground, and held, as a general principle of international law, that a mere cession of territory only operates upon the sovereignty and jurisdiction, including the right to the public domain, and not upon the private property of individuals which had been segregated from the public domain before the cession. This principle is asserted in the cases of

*United States* v. *Arredondo*, 6 Pet. 691; *United States* v. *Percheman*, 7 Pet. 51, 86–89; *Delassus* v. *United States*, 9 Pet. 117; *Strother* v. *Lucas*, 12 Pet. 410, 428; *Doe* v. *Eslava*, 9 How. 421; *Jones* v. *McMasters*, 20 How. 8, 17; and *Leitensdorfer* v. *Webb*, 20 How. 176. In *United States* v. *Percheman*, Chief Justice Marshall said : "It may not be unworthy of remark, that it is very unusual, even in cases of conquest, for the conqueror to do more than to displace the sovereign and assume dominion over the country. The modern usage of nations, which has become law, would be violated ; that sense of justice and of right which is acknowledged and felt by the whole civilized world would be outraged, if private property should be generally confiscated, and private rights annulled. The people change their allegiance ; their relation to their ancient sovereign is dissolved ; but their relations to each other, and their rights of property, remain undisturbed. If this be the modern rule even in cases of conquest, who can doubt its application to the case of an amicable cession of territory ? Had Florida changed its sovereign by an act containing no stipulation respecting the property of individuals, the right of property in all those who became subjects or citizens of the new government would have been unaffected by the change." 7 Pet. 86, 87.

But whilst this is the acknowledged rule in cases of ceded, and even conquered territory, with regard to titles acquired from a former sovereign who had undoubted right to create them, it does not apply (as we shall see) to cases of disputed boundary, in relation to titles created by a sovereign in possession, but not rightfully so. In the latter case, when the true boundary is ascertained, or adjusted by agreement, grants made by either sovereign beyond the limits of his rightful territory, whether he had possession, or not, (unless confirmed by proper stipulations,) fail for want of title in the grantor. This is the general rule. Circumstances may possibly exist which would make valid the grants of a government *de facto;* as, for example, where they contravene no other rights. Grants of public domain made by Napoleon as sovereign *de facto* of France, may have had a more solid basis of legality

than similar grants made by him as sovereign *de facto* of a Prussian province, derogatory to the rights of the government and King of Prussia.

As the case before us depends upon a disputed boundary between two states, it cannot be properly understood or determined without adverting to the historical facts connected with that boundary. Some of these are referred to by the Supreme Court of Florida in its opinion, but several others are necessary to be stated in order to show the circumstances under which the boundary between Georgia and Florida was finally settled, and to determine whether the assumption of the court, that the territory containing the land in controversy was ceded by Georgia to Florida, is well founded. The case, if it can be avoided, ought not to be decided upon a narrow selection of facts which might determine the question one way, before one jury, to-day, and another way, before another jury, to-morrow; but upon a broad view of all the historical events which relate to this boundary line. We shall proceed, therefore, to review these events as far as they have come to our knowledge from public documents.

In early colonial times, there were always mutual complaints of encroachment between the British provinces and the Spanish province of Florida, sometimes resulting in military conflicts; and no boundary was ever settled between them. The difficulty was finally removed by the treaty of 1763, by which Florida was ceded to Great Britain. See Treaty, Arts. VII, XX, 1 Chalmers's Collection of Treaties between Great Britain and other Powers, 473, 479. Soon after this event, on the 7th of October, 1763, King George III, by proclamation, erected governments in the newly acquired territories of Canada and the Floridas, and established the boundaries of the latter as follows, to wit: "The government of East Florida, bounded to the westward by the Gulf of Mexico and the Appilachicola River; *to the northward by a line drawn from that part of said river where the Chattahoochee and Flint rivers meet to the source of St. Mary's River*, and by the course of the said river to the Atlantic Ocean." West Florida was bounded north by the parallel of 31° north latitude, from the

Mississippi to the Chattahoochee River. See Proclamation in
Amer. State Papers, 1 Pub. Lands, 36; and 1 Bioren's Laws
U.S. 443. On January 20, 1764, the province of Georgia was
limited to the north of the line thus prescribed for Florida.
1 Bioren's Laws, 448–9.

The above defined line, from the junction of the Chattahoo-
chee and Flint rivers to the source of the St. Mary's, has from
1763 to the present time been the recognized boundary line
between Georgia and Florida. The land in controversy is
situated about midway between its extremities.

By the definitive-treaty of peace with Great Britain in 1783
the line above described was adopted as the southern boundary
line of the United States, and the Floridas were at the same
time, by another treaty, ceded to Spain. See Treaties and
Conventions between the United States and Other Powers,
Washington, 1873, pp. 315, 316; 2 Chalmers's, 232 — Treaties
of 1783. By the treaty of October 27th, 1795, between the
United States and Spain, this boundary was confirmed, and it
was provided that a commissioner and a surveyor should be
appointed by each party to meet at Natchez within six months
from the ratification of the treaty, and proceed to run and
mark the boundary line, and make plats and keep journals of
their proceedings, which should be considered as part of the
treaty. Our Government appointed Andrew Ellicott, Esq., as
commissioner, in May, 1796, and a surveyor to assist him, and
they proceeded to Natchez, and after much procrastination on
the part of the Spanish authorities, a Captain Stephen Minor
was appointed on the part of Spain, and the joint commis-
sioners of the two countries, in 1798 and 1799, ran and
marked the boundary line from the Mississippi to the Chat-
tahoochee, and determined the geographical position of the
junction of the Chattahoochee and Flint rivers to be in N.
latitude 30° 42′ 42.8″ and W. longitude 84° 53′ 15″. The
hostility of the Creek Indians prevented them from running
the line east of the Chattahoochee; but they sailed around
the coast of Florida, and up the river St. Mary's, and fixed
upon the eastern terminus of the straight line prescribed in
the treaties at the head of the St. Mary's, where it issues from

the Okefenoke Swamp, and erected a mound of earth to designate the spot. This was in February, 1800. The mound is still in existence, and is called Ellicott's Mound, and appears on all the principal maps of that part of the country. The commissioners, supposing that the true head of the river was located in the swamp, agreed that it should be considered as distant two miles northeast from the mound, and that in running the boundary line from the Chattahoochee it should be run to the north of the mound, and not nearer to it than one mile. The point fixed upon as the head of the St. Mary's was determined by observations to be in N. latitude 30° 21′ 30½″, W. longitude 82° 15′ 45″. The distance by straight line, or great circle, from the junction of the Chattahoochee and Flint rivers to the head of the St. Mary's, was calculated at $155\frac{2}{10}$ miles, and the initial course, for running the line from each terminus, was given, with the proper corrections to be made at intervals in order to follow the great circle. The commissioners signed a joint report of their proceedings, and transmitted the same to their respective governments. All these particulars are set forth in Mr. Ellicott's journal, and are matters of public history. See Ellicott's Journal: Philadelphia, 1803.

It thus appears that, by authority of the United States and Spain, the termini of the line in question were fixed and settled in February, 1800. It only remained for any competent surveyor to follow the directions of the commissioners in order to trace the actual boundary line on the ground.

The country in the region traversed by this line was occupied, in the early part of the century, by the nation of Creek Indians, and there was no immediate demand for having it run and marked. And as, under the Constitution, no state could enter into a treaty with the Indians, it became the interest of Georgia to make some arrangement with the Government of the United States to take measures for the gradual removal of Indian occupancy. A convention was accordingly entered into between Georgia and the United States, on the 24th of April, 1802, by which the former ceded to the latter all her territory between the Chattahoochee and

the Mississippi rivers, and the United States ceded to Georgia all their right to any public lands south of Tennessee and the Carolinas, and east of the Chattahoochee, not within the proper boundaries of any state; and agreed to extinguish the Indian title within the State of Georgia as early as could be peaceably done.  (See Agreement, 1 Bioren's L. 488.)  In pursuance of this agreement the title of the Creek Nation was extinguished throughout most of the southern part of the state by the treaties made with the nation in 1802, 1805, and 1814. 7 Stat. 68, 96, 120.

The State being now desirous of disposing of her lands and introducing settlers thereon, naturally turned her attention to the question of the true location of the boundary line between her own territory and that of the Spanish province of Florida. Some person, professing to be better posted than others as to the topography of the country about the head of St. Mary's River, asserted that the commissioners, Ellicott and Minor, in seeking its source, had ascended the wrong branch — namely, the north branch; whereas the true St. Mary's, or main stream, came from the west and took its source many miles further south than the point fixed upon by them.  The legislature of Georgia took up the matter, and in December, 1818, the Senate passed a resolution requesting the Governor to appoint proper persons to proceed, without delay, to ascertain the true head of St. Mary's river; and if it should appear that the mound thrown up by Ellicott and Minor was not at the place set forth in the treaty with Spain, that they make a special report of the facts, and that the Governor communicate the same to the President of the United States, with a request that the lines might be run agreeably to the true intent and meaning of the treaty.  Ex. Doc. No. 77, 1 Sess. 23d Cong., pp. 11, 86.

In pursuance of this request the Governor appointed three eminent engineers, Generals Floyd, Thompson and Blackspear, to make the examination suggested, and immediately, by a letter dated February 17, 1819, communicated the fact to the Executive Government at Washington.  The engineers made a careful reconnaissance of the country about the head streams

of the St. Mary's, accompanied by the person who had made the supposed discovery, and became satisfied that his information was at fault, and reported that, after a careful examination, they found the head of the river to agree with the report made by Mr. Ellicott. This result was also communicated to the Executive at Washington; and thus ended, for the time being, the claim on the part of Georgia to have the eastern terminus of the boundary line readjusted and changed. Soon after this proceeding, in 1819, the state employed one J. C. Watson to run and mark the line. This is the origin of the line called Watson's line; and to this line the State laid out its counties and townships, surveyed its public lands, and made grants to settlers. But it nowhere appears that this line ran to Ellicott's mound, or near to it: on the contrary, it would seem from other conceded facts, that it ran considerably south of it. As we have already seen, the lands in controversy in the present case adjoin this line, being situated on the north side of it.

Florida was ceded to the United States in 1819, and possession of the territory was taken by General Jackson in July, 1821. In 1825, the Surveyor General of the Government for the Territory of Florida, preparatory to a survey of the public lands therein, caused the boundary line between Georgia and Florida to be run out and marked by D. F. McNeil, a deputy surveyor, and the line so run was called *McNeil's line.* At the point in controversy, which (as before said) is about midway between the two extremities of the straight line called for by the treaty, it ran, according to the testimony, 14 chains to the north of Watson's line; but how near it approached Ellicott's mound at the eastern extremity does not appear. The government surveys in Florida were made to bound on this line; and, of course, overlapped, more or less, the Georgia surveys and grants extending to Watson's line.

The State of Georgia, about this period, perhaps in consequence of the location of McNeil's line, by a communication of her Governor to the Government of the United States, requested that joint measures should be undertaken for a mutual and final settlement of the boundary. The matter

being referred to Congress, an act was passed on the 4th of May, 1826, by which the President was authorized, in conjunction with the constituted authorities of the State of Georgia, to cause to be run and distinctly marked the line dividing the Territory of Florida from the State of Georgia, from the junction of the rivers Chattahoochee and Flint, to the head of St. Mary's River; and for that purpose, to appoint a commissioner or surveyor, or both: "*Provided*, that the line so to be run and marked shall be run straight from the junction of said rivers Chattahoochee and Flint, to the point designated as the head of St. Mary's River by the commissioners appointed under the third article of the treaty" [with Spain made October 27th, 1795]. 4 Stat. 157. This act, it will be seen, adopted the eastern terminus of the line as settled by Ellicott and Minor.

The President thereupon appointed ex-Governor Thomas M. Randolph, of Virginia, as commissioner under the act, and the Executive of Georgia appointed Thomas Spalding; and the commissioners entered upon their joint duties in February, 1827, and appointed John McBride as their common surveyor. They continued their operations for over two months; but the Georgia commissioner having, as he supposed, notwithstanding the report of the commissioners of 1819, discovered that the western branch of the St. Mary's River was the largest and longest stream, and, therefore, the true river, the Governor of the State suddenly brought the survey to a close by recalling the assent of Georgia and withdrawing the powers of her commissioner. Ex. Doc. 77, 1st Sess. 23d Cong., pp. 31, 97.

From this time onward, for many years, a controversy was carried on between Georgia, on the one side, and the United States and Florida, on the other, with regard to this boundary line; Georgia contending that the line should be run to Lake Randolph, the head of the western or southern branch of the St. Mary's, and the United States and Florida contending that it should run to the head of the northern branch, as settled and determined by the commissioners, Ellicott and Minor, under the treaty. Ib., and Ex. Doc. 152, 1st Sess. 23d Cong.

In 1845 Florida was admitted into the Union as a state,

embracing all the territories of East and West Florida, as ceded by Spain to the United States by the treaty of 1819. 5 Stat. 742, 743. Renewed efforts were soon afterwards made by Florida and Georgia to effect a settlement of the boundary, but without success.

In 1850 the State of Florida filed a bill in this court against the State of Georgia, to procure a determination of the controversy. In December Term, 1854, the Attorney General was allowed to intervene on the part of the United States. *Florida* v. *Georgia*, 17 How. 478. Evidence was taken by the parties, but in consequence of the war, and the final settlement of the controversy by mutual agreement, the cause was never brought to a hearing.

In 1857 the governors of the two states had a conference which resulted in an agreement by which Georgia relinquished her pretensions to have the eastern terminus of the line changed, and the termini fixed by the commissioners, Ellicott and Minor, were substantially adopted. The following resolutions and enactments of the legislatures of the two states will show the course of the negotiation, and the terms of the arrangement finally concluded between them.

On the 24th of December, 1857, the following resolution was adopted by the Legislature of Georgia, to wit:

" Whereas in the matter of controversy now pending in the Supreme Court of the United States, between the State of Florida and the State of Georgia, touching the boundary line of the two States, we deem it of much importance that this protracted and expensive litigation should cease; and whereas, with a view to the settlement of the question, a negotiation has been progressing between the late Executives of the aforesaid States, the result of which was an agreement to adopt the terminal points of the present recognized line as the true terminal points of the boundary line to be re-surveyed, corrected and marked, provided it is shown by either party, that the present line is incorrect, the agreement aforesaid being made subject to the ratification of the legislatures of the two States.

" *Resolved,* 1st, That we do hereby ratify the action of the

late Executive of this State, in accepting the proposition of
the Governor of Florida, to adopt the terminal points of the
present recognized line as the true terminal points of the
boundary line, and will regard, adopt, and act upon the pres-
ent line, as run and recognized between those points, as the
settled boundary of the two States, or will so recognize and
adopt any other line between those points which may be ascer-
tained and established on a re-survey and re-marking of the
boundary, provided said boundary correction is made by virtue
of law, and by joint action of the States aforesaid.

"2d. *Be it further resolved by the authority aforesaid,* That
should it be deemed essential or important by either State to
have the boundary line between the terminal points of the
present recognized boundary re-surveyed and re-marked, the
Governor of this State is hereby authorized to appoint a com-
petent surveyor, to join any such surveyor appointed on the
part of Florida, to run out and mark distinctly such a line from
one to the other terminal point herein indicated, to be known
as the line and settled boundary between the two States, the
surveyor on the part of Georgia to be paid such compensation
as may be determined on by the present or any future legis-
lature.

"3d. *And be it further resolved,* That the Governor of this
State shall, so soon as the same shall have passed both branches
of the present General Assembly, transmit a certified copy to
the Governor of Florida.

"Approved December 24th, 1857." Laws, 1857, Georgia,
326.

This resolution was responded to by the Legislature of Flor-
ida on the 12th of January, 1859, by passing a resolution in
precisely the same terms, *mutatis mutandis;* and on the 15th
of the same month an act was passed by the Legislature of
Florida for bringing into market, as soon as the line should be
settled, all state lands bordering thereon, that had not been
disposed of, giving to the occupants, whose right was not dis-
puted, five months to purchase the lands occupied by them at
their appraised valuation.

As one, or both, of the parties desired to have a re-survey

made between the terminal points, the State of Georgia appointed George F. Orr and the State of Florida B. F. Whitner, surveyors, to run and mark the line accordingly. They commenced their work in 1859, and it is referred to in the subsequent acts and resolutions.

An act was passed by the legislature of Georgia on the 16th of December, 1859, referring to the fact that the joint surveyors were running their first trial line, and agreeing to adopt it as conclusive, if Florida would do the same; *provided* that, on the eastern terminus, it did not depart exceeding one-fourth of a mile from Ellicott's mound; but that if it was not accepted by Florida, and if, therefore, a new line would have to be run so as to get a straight line from the mouth of Flint River to Ellicott's mound, that then, the line thus designated and marked by the surveyors, should be the permanent boundary between the two states. The act also proposed the passage of laws to quiet the titles of *bona fide* holders of lands under grants of either Georgia or the United States. The response made by the legislature of Florida to this proposition was the passage of an act on the 22d of December, 1859, substantially adopting the proposition made by Georgia, declaring "That the line now being run by B. F. Whitner, Jr., on the part of Florida, and G. J. Orr, on the part of Georgia, be and the same is hereby recognized and declared to be the permanent boundary line between the two states, so soon as the same shall be permanently marked by said surveyors: *Provided,* that said line, at its eastern terminus, does not depart from, or miss, Ellicott's mound more than one-fourth of a mile or 20 chains;" and declaring, secondly, "that the titles of *bona fide* holders of land under any grant from the State of Georgia, which land may fall within this state by the foregoing line, are hereby confirmed and conveyed to said holders, so far as any right may accrue to this state: *Provided,* nothing herein shall apply to lands to which citizens of this state may claim title south of what is known as the McNeil line."

It turned out that the line run by Orr and Whitner ran even farther north than the McNeil line; but it came within the stipulated distance from Ellicott's mound — namely, with-

in a quarter of a mile — in fact, within 37 links, or less than 25 feet, north of the mound. (See Code of Georgia, 1868, § 19.) This was more favorable to Georgia than the line agreed on by Ellicott and Minor, which was to run at least one mile north of the mound.

On the 14th of December, 1860, the Legislature of Georgia, probably considering that its last proposition was not fully accepted, passed a resolution, directing the Governor to reopen negotiations with the authorities of Florida in regard to the boundary line, and to urge its adjustment so as to protect the rights of citizenship and the titles of lands held under grants from Georgia; and, if practicable, so as to retain and keep the fractional lots sold by Georgia within the jurisdiction of the state. In response to this resolution, the Legislature of Florida, on the 8th of February, 1861, passed the following resolution, to wit: "*Whereas* [by] an act approved by the Governor 22d December, 1859, it was by the General Assembly enacted that the line then being run by B. F. Whitner, Jr., on the part of Florida, [and] G. J. Orr, on the part of Georgia, should be, and was thereby, recognized and declared to be the permanent boundary line between the States of Georgia and Florida as soon as the same should be permanently marked by said surveyors: *Provided*, the said line at its eastern terminus did not depart from or miss Ellicott's mound more than one-fourth of a mile, or twenty chains; *and whereas*, the said line has been run and marked by said surveyors on the part of the two states, the eastern terminus of which, so run and marked, is within the distance prescribed in said proviso: Therefore, *Resolved*, That the line run and marked by B. F. Whitner, Jr., on the part of Florida, and G. J. Orr, on the part of Georgia, be, and the same is hereby declared to be, the permanent boundary line between the two States of Georgia and Florida, and that the Governor be, and he is hereby, requested to issue his proclamation that the said line, so run and marked, has been and is declared to be the permanent boundary line between the two states: *Provided*, the State of Georgia shall have on its part declared the said line to be the boundary between that state and Florida. *Be*

*it further resolved,* That the Governor be requested to forward a copy of these resolutions to the Governor of Georgia, with a request that similar steps be taken by Georgia, so that the question of boundary may be finally settled." Bush's Digest, 103; McClelland's Digest, 952.

By a long and argumentative resolution, passed by the Legislature of Georgia on the 11th of December, 1861, after stating the respective positions taken by the two states, it was proposed as follows: "The General Assembly, to avoid further dispute, proposes to her sister state, Florida, that what is denominated the Watson line (which will leave in the limits of this state the fractional lots of land heretofore sold under an act of her legislature) shall be adopted as the boundary line. The settlement upon this basis will not interfere with the rights of citizenship, as claimed by the citizens of either state." Florida made no answer to this proposition.

Finally, by a resolution passed on the 13th of December, 1866, the Legislature of Georgia, referring to the act of 16th December, 1859, and recognizing the fact that the Orr and Whitner line, as run, did not depart exceeding one-fourth of a mile from Ellicott's mound, and referring also to the action of the Florida legislature of February 8th, 1861, adopted the Orr and Whitner line as "the permanent boundary line between the States of Georgia and Florida." And this agreement, thus finally arrived at by the two states, was recognized and confirmed by an act of Congress approved April 9th, 1872, entitled "An act to settle and quiet the title to lands along the line between the States of Georgia and Florida," by which it was declared "that the titles to all lands lying south of the line dividing the States of Georgia and Florida, known as the Orr and Whitner line, lately established as the true boundary between said states, and north of the line run by Georgia, known as the Watson line, being all the lands lying between said lines, be, and the same are hereby, confirmed, so far as the United States has title thereto, in the present owners deriving titles from the State of Georgia."

This historical review is sufficient, it seems to us, to show that the agreement come to by the two states was not in fact,

and cannot be construed as, a cession of territory on the part of Georgia. It was simply the correction of the boundary line. Georgia had inadvertently extended her jurisdiction to a line run by her surveyor too far south. The agreement recited in the resolution of December 24th, 1857, "to adopt the terminal points of the present recognized line as the true terminal points of the boundary line," carried out by a re-survey of such line from one of its terminal points to a point sufficiently near the other to satisfy both parties, must be construed to be the carrying out of an intent to settle and establish the true line between the two states, and not an intent to adopt a line different from the true one, with a cession of the territory cut off by it. Two lines had been contended for. Florida and the United States contended for the line established by the joint commission under the treaty with Spain; Georgia, for a different line, having a widely different terminus at its eastern extremity. Each claimed that its line was the true one. Georgia finally yielded the point, and accepted the commissioners' line. This was tantamount to an acknowledgment that it was the true line. We do not say that the result would have been different if the parties had adopted a compromise line — as, for example, the Watson line, which was proposed by Georgia. When a boundary is in dispute the adoption of a line by compromise may be considered as an agreement that the adopted line is the true line, or that it shall be considered as the true line. Where territories are coterminous, they must have a common boundary. That boundary, whether ascertained by astronomical observations, or discovery of old monuments, or mutual agreement of the parties, is to be regarded and treated as if it had always been known as the true line. The present case, at all events, can only be regarded as one in which the boundary line finally agreed to was always the true line, even though, and even when, a different line (Watson's) was temporarily adopted by Georgia, and acquiesced in by Florida.

Then what becomes of the titles granted by Georgia outside of that line, or south of it? She had no title there herself. Could she confer title by the mere exercise *de facto* of juris-

diction and government there—such exercise being in derogation of the successive rights of Spain, the United States, and Florida? What authority can be found to justify such a pretension? It is the common usage, it is true, in mutual adjustments of disputed boundaries, to stipulate that private titles shall not be disturbed. Such stipulations are dictated by a humane consideration for those who have innocently invested their fortunes on the faith of the good title of their government. In the present case, as we have seen, the titles granted by Georgia were confirmed both by Florida and by the United States, so far as either had any right or title to be affected. But those confirmations cannot avail the plaintiffs in the present case; for the United States had parted with all their interest in the lands in controversy, by a grant to Florida in July, 1857; and Florida had disposed of all her interest therein by a regular sale in September of the same year. Neither the United States nor Florida, therefore, had any interest remaining, when the confirmatory acts were passed, which they could transfer by release or confirmation, or in any other mode.

The case, then, stands upon the original validity of the Georgia grants; and the question may well be asked, how does a land holder who obtains title from a sovereign that has none, stand in any better position than one who obtains title from an individual that has none? Georgia had no title to the land. Previous and subsequent historical events abundantly show this. Her grants have nothing to rest on but her actual possession of the disputed territory and her exercise of government *de facto* therein. The question is, whether this is sufficient.

The general subject is not a new one in the jurisprudence of this court. Before the treaty of amity and limits made with Spain in 1795, that government had claimed and occupied, as a part of West Florida, a large extent of country on the east side of the Mississippi, to the north of north latitude 31°—including a large portion of the present State of Mississippi. This claim was based on an extension of the province of West Florida to the northward by the Government of Great Britain

prior to the Revolutionary war. See 1 Bioren's Laws U. S., pp. 449–453; 2 Pitkin's Hist. U. S., 434–6. It was abandoned by the treaty referred to, and the parallel of 31°. was adopted as the boundary line between the territories of the United States and those of Spain. But prior to that treaty the Spanish authorities had made grants of land in the territory referred to. This court invariably held those grants, not confirmed by our Government, to be invalid, on the ground that the territory did not belong to Spain, though she occupied it and claimed to own it. This point is decided in Henderson v. Poindexter, 12 Wheat. 530; followed by Hickey v. Stewart, 3 How. 750; Robinson v. Minor, 10 How. 627; and other cases. In Henderson v. Poindexter, Chief Justice Marshall carefully examined the question of the right of Spain to the territory, and showed that it was untenable, and strenuously argued that the treaty of 1795 was an acknowledgment on the part of Spain that she had no such right; — or, why did she give it up? The idea of a grant deriving any validity from national occupancy, and government de facto over the territory, was not even hinted at, although Mr. Webster and Mr. Coxe argued the cause for the party claiming under the Spanish grant. The view taken by this court on the subject was accurately expressed by Mr. Justice McLean, in delivering the opinion in Robinson v. Minor, 10 How. 643, where he says: "The treaty with Spain established [i.e. settled] a disputed boundary; there was no cession of territory. The jurisdiction exercised by Spain over the country north of the 31st degree of north latitude was not claimed or occupied by force of arms against an adversary power; but it was a naked possession, under a misapprehension of right. In such a case, Georgia, within whose sovereignty the country was situated, was not bound to recognize the grants or other evidence of title by the Spanish government."

The same view was taken by the court with regard to the grants made by Spain in the disputed territory of West Florida after the cession of Louisiana to the United States in 1803. Spain had held possession of Louisiana and the Floridas; but, by the secret treaty of St. Ildefonso, made in 1800, had ceded

Louisiana to France, " with the same extent that it now has in the hands of Spain, and that it had when France possessed it;" and, in 1803, France ceded it to the United States in the same terms. But as formerly possessed by France, Louisiana included West Florida as far as to the river Perdido, and our government claimed to the same extent. Spain, with a good deal of plausibility, contended that West Florida, extending from the Mississippi to the Perdido, was held as a distinct province by Great Britain prior to 1783, and was not embraced in the cession, and refused to surrender it, and kept possession of it in the exercise of full sovereignty until 1810, when the United States took forcible possession of it. Here was another case of disputed boundary. The United States claimed the river Perdido; Spain, the rivers Mississippi and Iberville, as the true boundary between Louisiana and the Floridas; and the latter was in possession of the disputed territory, exercising all the powers of government therein from 1803 to 1810. During this period the Spanish governors made many grants of land in the territory, which often came before this court for adjudication; and the decision was invariably against their validity.

The first case in which the question arose was that of *Foster* v. *Neilson*, 2 Pet. 253, in which the grant was made in 1804, for land in the district of Feliciana, east of the Mississippi. The principal questions argued were, first, the true interpretation of the treaties of 1800 and 1803, as to what territory was ceded to the United States; and, secondly, the effect of the confirmation of Spanish grants contained in the treaty of 1819. Mr. Coxe, it is true, took the ground that the acts of a sovereign power over territory it has ceded are lawful until possession has been transferred, and, therefore, that the grants of Spain whilst still in possession and exercising the powers of government *de facto* should be held to be valid. Mr. Webster, who was on the same side with Mr. Coxe, did not allude to this argument, and the court took no notice of it, but placed its decision on the ground that, by the true construction of the treaties, Louisiana included West Florida to the Perdido, and, therefore, that the territory in question did not belong to

Spain when the grant was made, and so the grant was invalid; but that if this were not a clear proposition (and the court admitted that it was a question of doubtful construction), the judiciary would nevertheless follow the action of the political department of the government, charged with the management of its foreign affairs, which had always contended for the line of the Perdido, and had finally taken full possession of the country.

The case of *Foster* v. *Neilson* was followed in the subsequent cases of *Garcia* v. *Lee*, 12 Pet. 511; *United States* v. *Reynes*, 9 How. 127; *United States* v. *D'Auterive*, 10 How. 609; *United States* v. *Philadelphia & New Orleans*, 11 How. 609; *Montault* v. *United States*, 12 How. 47; *United States* v. *Castant*, 12 How. 437; all of which are referred to, and the history of the controversy is given, in *United States* v. *Lynde*, 11 Wall. 632.

It may, however, be said that the decision in these cases was controlled by the act of Congress approved March 26th, 1804, 2 Stat. 283, 287, the 14th section of which declared void all grants for lands within the territories ceded by the French Republic to the United States by the treaty of 30th April, 1803, the title whereof was, at the date of the treaty of St. Ildefonso, in the crown, government or nation of Spain; saving, however, the titles of actual settlers, acquired before December 20th, 1803.

It is doubtless true that this act did have a controlling influence in the cases referred to; but the court discussed the question upon general principles also, and no hint is dropped that the existence of a government *de facto* would have any influence on the decision.

In *Garcia* v. *Lee*, Chief Justice Taney expressly argues that, in a case of disputed boundary, titles must stand or fall with the right of the government creating them. His language is: "Indeed, when it is once admitted that the boundary line, according to the American construction of the treaty, is to be treated as the true one in the courts of the United States, it would seem to follow as a necessary consequence, that the grant now before the court, which was made by the Spanish

authorities within the limit of the territory which then belonged to the United States, must be null and void; unless it has been confirmed by the United States by treaty or otherwise. It is obvious that one nation cannot grant away the territory of another; and if a proposition so evident needed confirmation, it will be found in the case of *Poole* v. *Fleeger*, 11 Pet. 210. In that case there had been a disputed boundary between two States, and the parties claimed the same land under grants from different States. The boundary line had been ascertained by compact between the States after the grants were made. And in deciding between the claimants in that case the court said: 'In this view of the matter it is perfectly clear that the grants made by North Carolina and Tennessee, under which the defendant claimed, were not rightfully made, because they were originally beyond her territorial boundary; and that the grant under which the claimants claim was rightfully made, because it was within the territorial boundary of Virginia.' And again, 'If the States of North Carolina and Tennessee could not rightfully grant the land in question, and the States of Virginia and Kentucky could, the invalidity of the grants of the former arises, not from any violation of the obligation of the grant, but from an intrinsic defect of title in the States.'"

The case of *Poole* v. *Fleeger*, 11 Pet. 185, quoted by Chief Justice Taney, is much to the purpose. The northern boundary of North Carolina (including Tennessee) was fixed by the charter of 1665, and by the constitutions of that State and Virginia, adopted in 1776, on the parallel of 36° 30′ north latitude. In 1779 an attempted survey of the line was made by commissioners of the two States, who failed to agree; but a line run by Dr. Walker, one of the commissioners, was practically used as the boundary of jurisdiction. It was afterwards found to be too far north by several miles, and a line was run on the true parallel by Professor Matthews, of Transylvania University. Tennessee laid out her counties and exercised all sovereign jurisdiction up to the Walker line, and both North Carolina and Tennessee made grants of land up to that line and north of the true parallel. On the other

hand, Kentucky made grants south of that line and up to Matthews' line.  In 1820, Kentucky and Tennessee agreed to adopt Walker's line as the boundary of the two States; but it was stipulated that all private rights and interests of land between the two lines, theretofore derived from either State, should be considered as rightfully emanating therefrom; but all vacant and unappropriated lands within those limits were declared to belong to Kentucky and subject to her disposal. No provision was made for cases of conflicting grants of the same land made by Virginia or Kentucky, on one side, and by North Carolina or Tennessee, on the other.  The case before the court was one of that kind, the plaintiffs claiming under a Virginia warrant and a grant made by Kentucky in pursuance thereof, in 1796; the defendants claiming the same land under North Carolina grants made in 1786, 1792, 1797, and Tennessee grants of subsequent years; and the lands in controversy being situated between the two lines before mentioned.  This court held that the parallel of 36° 30' was always the true line until altered by agreement of the two States in 1820, and that the grants made by North Carolina and Tennessee, north of that line, were void, and that the Virginia and Kentucky grants were good, notwithstanding the actual occupation of the disputed territory by Tennessee. The adoption of Walker's line in 1820 was held to have changed the true and original boundary only for the purpose of future jurisdiction.  Evidence of the previous exercise of jurisdiction by Tennessee up to Walker's line was not allowed to affect the question of title; although the defendants proved that North Carolina and Tennessee had claimed to Walker's line as the true line from the time it was run to the time of the treaty or agreement of 1820; that the county lines of Tennessee were Walker's line on the north; that in her legislative, judicial and military capacity, Tennessee always claimed possession and acted up to said line as the northern boundary of the State; that process was executed, criminal acts were punished, taxes were paid, militia was enrolled, and all other acts done in subordination to the laws and government of Tennessee up to that line; and corresponding jurisdiction was exercised by Kentucky to the same line on the other side.

Here was a case of mistaken boundary, and when the error was discovered, the States concerned agreed to adopt it as the permanent political boundary for the future, conceding, on both sides, that it was not the true original boundary. Mr. Justice Story, delivering the opinion of the court, said: "Although, in the compact, Walker's line is agreed to be in future the boundary between the two States, it is not so established as having been for the past the true and rightful boundary; on the contrary, the compact admits the fact to be the other way. While the compact cedes to Tennessee the jurisdiction up to Walker's line, it cedes to Kentucky all the unappropriated lands north of the latitude of 36° 30′ north." Then, after further remarks of the same purport, follows the passage quoted by Chief Justice Taney, to the effect that the grants of North Carolina and Tennessee were not rightfully made, because they were originally beyond their territorial boundary.

The case of *Poole* v. *Fleeger* covers the case now under consideration. It was a case of disputed boundary, and Tennessee exercised sovereign jurisdiction *de facto* up to a certain line (Walker's) which she claimed to be the true boundary line, and made grants of land to that line, just as Georgia did in the present case to Watson's line. Walker's line, like Watson's, was found not to be the true line, and the grants made by Tennessee were found to be for lands in territory belonging to Kentucky; just as the grants of Georgia, next to Watson's line, were found to be for lands in the territory belonging to the United States and Florida. This court decided that the Tennessee grants were void, notwithstanding the exercise of sovereign jurisdiction *de facto* by that State over the territory in dispute, when the grants were made. If that decision was correct, the grant made by Georgia of the land in controversy must be held to be invalid for the same reason. The only difference between the cases is, that Kentucky and Tennessee adopted the erroneous line as their permanent boundary, though recognizing the fact that it was not the true original line; whilst in the present case Georgia and Florida adopted the nearest practicable approach to the

true line as their permanent boundary. This difference does not affect the question, except to make the present case the stronger of the two.

The only authority cited by the Supreme Court of Florida for the proposition that a government *de facto* can make a valid grant, is a *dictum* of Mr. Justice Baldwin, in delivering the opinion of the court in the case of *Rhode Island* v. *Massachusetts*, 12 Pet. 657, at page 748. The question there was, whether the people whose lands would be affected by the change of state line involved in that case ought to be made parties to the suit. Justice Baldwin says: "It is said that the people inhabiting the disputed territory ought to be made parties, as their rights are affected. It might with the same reason be objected that a treaty or compact, settling boundary, required the assent of the people to make it valid, and that a decree under the ninth article of confederation was void, as the authority to make it was derived from the legislative power only." The same objection was overruled in *Penn* v. *Baltimore;* and in *Poole* v. *Fleeger*, this court declared that an agreement between States, consented to by Congress, bound the citizens of each State." Thus far, the reasoning of the court was unanswerable. Settlements of boundary belong to the sovereign power, and cannot be questioned by individuals. But the learned Justice proceeds to lay down what he supposes to be two principles of the law of nations, which were entirely unnecessary to the decision of the question of parties which he was considering. He says: "There are two principles of the law of nations, which would protect them [private citizens] in their property: 1st, That grants by a government *de facto*, of parts of a disputed territory in its possession, are valid against the State which had the right; 12 Wheat. 600, 601 ; 2d, That when a territory is acquired by treaty, cession, or even conquest, the rights of the inhabitants to property are respected and sacred. 8 Wheat. 589, &c." This is the passage quoted and relied on by the Supreme Court of Florida.

The second of these propositions is in accordance with what we have already stated to be the received rule of international law ; but the first is opposed to the cases which we have

already cited in relation to Spanish grants in Mississippi and West Florida, and to the case of *Poole* v. *Fleeger.* As to the authority referred to, 12 Wheat. 599, 600, 601, it is a mere *dictum* of Mr. Justice Trimble in *De la Croix* v. *Chamberlain,* clearly inconsistent with the decision made at the same term in *Henderson* v. *Poindexter's Lessee,* and with all the subsequent decisions above referred to, and as Mr. Justice Catron, in a manuscript note upon this part of Justice Baldwin's opinion, justly remarks, " no such question was raised in that case, and *Poole* v. *Fleeger* is certainly to the contrary."

We think that the decision of the Supreme Court of Florida is erroneous in deciding against the title of the plaintiff in error. That title is claimed under a grant from the United States, of land acquired by treaty with Spain, identified as such by the former treaty of limits and the proceedings of the commissioners appointed to carry out that treaty. The decision of the Supreme Court of Florida, in effect, is, either that the land was not embraced in the treaty of cession, or, if it was, that the possession of Georgia gave a superior right. We think it clear that the land was embraced in the treaty, and that the possession of Georgia did not give a superior right. The judgment is therefore reversed, and the cause remanded, with instructions to proceed according to law, in conformity with this opinion.

A point was made in the brief of counsel for defendants in error which was not raised in the courts below, and cannot, as now presented, be properly passed upon by us; namely, that the Register had no power under the state law to make the bargain with McCall and Stripling for the sale of the land, at the time he issued his certificate to them. This is a question of state law, and involves an issue of fact, and, if deemed important, may be raised on a new trial of the cause, which will necessarily be awarded as a consequence of the reversal of the judgment.

*Judgment reversed.*